Hudson Coal Company's Appeal.

Lackawanna County's Appeal.

Argued May 25, 1937. Before KEPHART, C. J., SCHAF-
FER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*J. H. Oliver*, with him *F. B. Gelder, E. D. Adair, Ru-
dolph Houck, Reese H. Harris, C. P. O'Malley* and *John
P. Kelly*, for appellant (No. 155), and appellee (No. 4).

*Philip V. Mattes*, County Solicitor, and *J. Julius
Levy*, with them *John M. Kelly*, Solicitor, for appellee
(No. 155), and appellant (No. 4).

OPINION BY MR. JUSTICE DREW, July 7, 1937:

In this case our decision will determine the market
value of all coal lands and the prevailing ratio between
market and assessed values of all realty in Lackawanna
County. The appeals are from the action of the court
below in modifying the triennial assessment for the pe-
riod 1934-1937 upon the coal lands of the Hudson Coal
Company in the Borough of Dunmore. The County

Board of Assessment fixed their market value at $400 per foot-acre and, by applying thereto a 75 per cent ratio between market and assessed value, obtained an assessed value of $300 per foot-acre. The court below found the market value to be $370 per foot-acre and the ratio to be 70 per cent, making an assessed value of $259 per foot-acre—a reduction in assessed valuation of $41 per foot-acre, $22.50 of which resulted from the $30 decrease in market value and $18.50 from the 5 per cent decrease in the ratio. From this action both the county and the company have appealed.

All owners and operators of coal lands in Lackawanna County severally appealed from the action of the Board of Assessment to the Court of Common Pleas. They have agreed that the testimony and decision in this case shall determine their appeals. Because of this the parties hereto stipulated that testimony concerning the value of coal lands should not be limited to Dunmore, but should include all coal properties in the county; that the findings of the court as to market value and ratio should govern all the appeals; and that the only question left open in the other cases is the quantity of taxable property. This stipulation applied solely to appeals from the county assessment. The court below approved this agreement, similar to that adopted in *Delaware, Lackawanna & Western Railroad Company's Tax Assessment (No. 1)*, 224 Pa. 240. Inasmuch as it appears that the foot-acre method of valuation was used and that market values as well as the ratio between market and assessed values in Dunmore were typical of the situation prevailing throughout the county in 1934, we approve the arrangement for the purposes of this case.

The so-called foot-acre method of determining market value was employed. A foot-acre is one acre of coal one foot thick. If the vein is six feet thick and its area is an acre, there are six foot-acres of coal. The foot-acre method does not include, for assessment purposes, ex-

hausted areas, barrier pillars, or coal areas entirely un-minable because of physical conditions. Also excluded are all areas of unproved minability. But if development and exploration discloses these to contain minable coal, they are included. The foot-acre method, as consistently employed in Lackawanna County for many years, has not been adopted in any other anthracite producing county. This may be because it is an average unit of value without classification. It has been condemned even where classified because in many instances its application would work hardship and do injustice: *Lehigh & Wilkes-Barre Coal Co.'s Assessment,* 298 Pa. 294; *Kemble's Estate,* 280 Pa. 441; *Lehigh & Wilkes-Barre Coal Co.'s Assessment,* 225 Pa. 272. However, it has been approved in special cases: see *Lehigh & Wilkes-Barre Coal Co.'s Assessment,* 298 Pa. supra; *Lehigh Valley Coal Company v. Luzerne Co.,* 255 Pa. 17. It was used by the court below with the consent of counsel on both sides who conceded that it worked an equitable result in Lackawanna County. It has been the only standard for measurement of value of coal lands in that county for more than thirty years. Classification of property which is the object of taxation is extremely desirable. It effects a much more equitable result than the application of an average measure. However, in this case, we feel bound to accept the foot-acre method of assessment as adopted by the Board of Assessment, the parties, and the court below.

These appeals come before us under the General County Assessment Law, the Act of May 22, 1933, P. L. 853, section 519, which is substantially a reënactment of the Act of June 26, 1901, P. L. 601, as amended by the Act of June 12, 1931, P. L. 547. Cases arising under these earlier statutes are authority here. Among them are decisions that while the question of the weight of the evidence is before us *(Lehigh & Wilkes-Barre Coal Co.'s Assessment,* 298 Pa. supra; *Rockhill Iron & Coal Co. v. Fulton County,* 204 Pa. 44) and it is our duty to

pass upon the findings of fact and conclusions of law of the court below, such findings will not be disturbed unless there is error in the ultimate determination: *Philadelphia and Reading Coal and Iron Co. v. Commissioners of Northumberland County*, 323 Pa. 185.

The correctness of the assessment as made by the Board of Assessment, and modified by the court below, is to be measured by the standard established by the legislature. The General County Assessment Law, section 402 provides, "It shall be the duty of the several elected and appointed assessors . . . to assess, rate and value all objects of taxation, whether for county, city, township, town, school, poor or borough purposes, according to the actual value thereof, and at such rates and prices for which the same would separately bona fide sell." And section 505 of the act imposes upon the Board of Revision the duty of determining whether property "has been valued at a sum or price not less than the same would bring after full public notice at a public sale. . . ." This means nothing more or less than market value. We have defined market value as the price which a purchaser willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied: *Lehigh & Wilkes-Barre Coal Co.'s Assessment*, 298 Pa. supra.

Two questions confront us—were these coal lands valued at their true market value, and did the court below apply the proper ratio between market and assessed value?

Our cases have clearly set forth the essential factors to be taken into consideration in determining the market value of coal lands. Where it is possible to do so such value should be established by showing recent sales of land of like quality and quantity similarly situated or recent sales of the lands being assessed: *Philadelphia & Reading Coal & Iron Co. v. Northumberland County Commissioners*, 229 Pa. 460. The testimony offered in

this case to show prices at which other lands sold fell far short of establishing the market value of appellant's property as of 1934. The few sales shown occurred long prior to this assessment. Two took place in 1919, when the coal industry was much more prosperous. A more recent sale of a coal property in Luzerne County was of no help. It did not furnish a sound basis for comparison because of differences in mining conditions. Other sales were of small properties, which could be mined immediately, and were in no sense comparable with the property under review. The statutory method of determining market value failed entirely in this case; there was no demand for coal properties and consequently there were no sales; the market was stagnant.

When faced with such a situation, the necessity of determining value being imperative, courts permit the introduction of other evidence likely to establish it. All relevant elements tending to appreciate or depreciate value are admissible. In such cases it is proper to adduce evidence upon all matters affecting probable selling price and any other element of value that would influence the mind of a purchaser: *Philadelphia & Reading Coal & Iron Co. v. Northumberland County Commissioners*, 229 Pa. supra. Of predominant importance among the factors entering into such value is demand for the product of the land. Obviously coal lands have little or no value if their product cannot be sold. As was well said by the present Chief Justice, "One of the most potential elements of market value is the demand for the thing to be sold or valued. Any contingency which detrimentally influences demand will have a corresponding effect on market value. If you cannot sell anthracite coal, the land from which it is to come would be practically worthless. If the demand for the product decreases, the market value of the land suffers accordingly": *Lehigh & Wilkes-Barre Coal Co.'s Assessment*, supra, at 302.

It is admitted by all that demand for anthracite has declined tremendously in the last fifteen years. Its consumption is confined almost exclusively to domestic use. Approximately five per cent of the total annual sales tonnage finds its way into industrial markets. While relatively few states contain anthracite deposits, Pennsylvania has imbedded in its soil ninety-five per cent of the known total amount in North America. It produces about ninety-nine per cent of the entire production of the United States; its profitable sales area is confined largely to the eastern seaboard. Official statistics show that even this is a vanishing market. Three factors have combined to decrease greatly the demand for anthracite in these states.

The first serious blow dealt the industry was the mid-winter strike of 1925-1926 which closed the sources of supply and caused householders to turn to substitute fuels. Until that time anthracite was unquestionably the best and most convenient fuel for domestic heating. It had a monopoly of the domestic market. Since then labor troubles have been of periodic occurrence, and each fresh outbreak has added to the number of those who have ceased permanently to use anthracite.

Even more disastrous has been the rapid natural substitution of other fuels. In Massachusetts, for example, according to statistics furnished by the Department of Labor and Industries of that Commonwealth, and admitted in evidence, consumption of bituminous coal for domestic use increased from 495,000 to 1,318,000 tons between 1928 and 1933, an increase of approximately 166 per cent. Domestic use of coke increased during the same period almost twenty-five per cent and the domestic consumption of oil rose from 80,000,000 to 400,000,000 gallons, an increase of 400 per cent. Gas installations for home use almost doubled. All this is exclusive of the phenomenal increase in the use of electricity for heat and power. While the sales of these fuels increased constantly and tremendously the sale of anthracite dropped

continuously and disastrously. Production declined from 73,006,000 tons in 1926 to 36,554,000 tons in 1933, a decrease of 40.32 per cent, while consumption decreased approximately thirty-eight per cent. Nor are these figures isolated examples of a purely local trend. Nation-wide statistics indicate a similar loss of market for coal products generally. In 1918, coal supplied eighty-one per cent of our national energy. By 1932 this had been reduced to fifty-two per cent.

The record reveals that the industry is plagued by enemies from within and without. Other nations are exporting anthracite far more cheaply than we can and our exports are fast declining. According to figures furnished by the Dominion Fuel Board in coöperation with the Canadian Department of Mines, exports of anthracite from the United States to the Provinces of Ontario and Quebec in the period from 1926 to 1931, declined from 2,777,013 to 2,134,213 tons, a decrease of almost twenty-five per cent. In these same years, imports of Welsh, Scotch and Russian anthracite to these provinces rose from 210,087 to 1,088,927 tons, an increase of 418 per cent. Canada, our chief export market, has in the past bought almost its entire anthracite supply from us. Now our producers furnish less than half its purchases.

Another factor that has undoubtedly brought about decreased sales of anthracite was the economic depression. It is admittedly not one of the more important causes of the decline in demand. This decline could not have been due primarily to the economic state of the times since it was at a constant rate of almost 5,000,000 tons a year, even during the business boom in 1927, 1928 and 1929. It antedated the depression and there is no immediate prospect of its cessation when the depression is over.

There is another factor responsible for the decline in demand—the high cost of anthracite to the consumer. Cheaper fuels prosper in competition because they do

not bear the same burdens in taxes, labor cost, freight rates, and so forth.

It would be difficult to imagine a more distressing picture of a great industry than that disclosed by the official report of the Anthracite Coal Industry Commission of Pennsylvania of May 15, 1937, in which it is said:

"The peak in anthracite production was reached during the war, at roughly 100 million gross tons a year. The beginning of the real decline came after the disastrous strike of 1925-1926. From 1926 to 1934 the trends of production, shipments and realizations from sales were all persistently and sharply downward. In 1934 there was some recovery, but 1935 and 1936 were again below 1934, contrary to the movement of economic activity in most parts of the country. Production in 1936, at under 52 million net tons, was only 75% of production in 1929; 66% of production in 1926, ten years before; only 58% of the peak production of 1917; and was hardly equal to the output of forty years before.

"These simple figures themselves tell most of the story. The steady shrinkage in output has inevitably been accompanied by large operating losses to the aggregate of the companies since 1932, by declining capital values and passed dividends, and recently by application of the largest company in the industry for relief under Section 77b of the Federal Bankruptcy Act. That other companies will likewise soon join the unhappy procession to the bankruptcy courts, unless some quick and drastic change takes place, seems almost inevitable. In 1935, on their own showing, the working capital of companies producing 90 to 95% of the total output was only $9 millions. This is a decline from $70 millions in 1929, and from $111 millions in 1926. In 1932-1935, these companies lost a total of $31 millions, and lost over $10 millions in 1935 alone.     .     .     .     .     .     .

.     .     .     .     .     .     .     .     .     .     .     .

"Such are the broad facts in the position of the anthracite industry to-day. In the aggregate it is a sick

industry; it is losing money steadily; it is faced with a new era of destructive price wars and possible bankruptcies; . . . The real size, power and financial worth of the industry are not half what they were a decade and a half ago."

It is not surprising that the evidence indicated a continuous decline in the market value of coal lands throughout Lackawanna County. While it was shown that anthracite producers hope to regain lost markets, and are trying to do so, and that the rate of decline has slightly decreased since 1934, this is immaterial, in the present appeal, since the question here is the market value of the property at the time of the assessment: *Philadelphia & Reading Coal & Iron Co. v. Northumberland County Commissioners*, supra.

It must be said that the evidence as to market value is so unsatisfactory that little reliance can be placed on it. The experts who testified to market value were of no help. Certain of the witnesses for the county admittedly did not include all the elements necessary to a proper determination of market value. They did not take into consideration the economic factors decreasing the value of coal lands—perhaps the most important single element in the case. This made their testimony worthless. However, it was admitted, and shows their valuations to be $600 to $800 per foot-acre. These valuations are clearly excessive. As long ago as 1926 Judge SEARLE of Lackawanna County, in re: *Appeal from the Assessment and Valuation of Lands in the City of Scranton*, No. 1013, March Term, 1924, Lackawanna County, declared that the court might well fix the value of a foot-acre of coal in Lackawanna County at $300. He, however, placed it at $400 to stabilize assessments because Judge NEWCOMB, of the same court, on June 30, 1921, had entered a decree fixing the market value at $400 per foot-acre.

The court below found there was a "general reduction in taxable value of property in Lackawanna County of

about 10 per cent." It did not recognize that coal lands had suffered a much greater reduction in value than other types of real estate. The court's action would have been much more equitable, and much more in keeping with the true facts of the case, if it had found that coal properties suffered a depreciation of 10 per cent in excess of that sustained by other real property.

We conclude that the market value of appellant's coal land is twenty per cent less than the valuation of $400 per foot-acre placed on it by the Board of Assessors. This makes the market value $320, which is $50 per foot-acre less than the valuation of the court below. While this may not measure with mathematical exactness the precise decline in market value, it is as accurate an approximation as it is possible to make.

This leaves only the question of whether the court below applied the existing ratio. The record contains a stipulation by the parties that the "board of assessors placed upon the assessment book all properties, including the coal in Lackawanna County, at seventy-five per cent of the amount which the assessors thought was the fair market value of the property." The assessment books were admitted in evidence, and thereupon a prima facie case was made out as regards market value and ratio. When the parties, the taxpayer and the county, stipulated that the existing ratio was seventy-five per cent, that concluded the matter, and the court should have so ruled. Instead it found the ratio to be seventy per cent, and without explanation. The stipulation showed the ratio was uniform at seventy-five per cent throughout the county, as required by Article IX, section 1, of our Constitution.

The market value of appellant's coal lands in Dunmore Borough is fixed at $320 a foot-acre; the ratio of 75 per cent, uniform throughout the county, applied to it makes its value for assessment for county taxes $240 a foot-acre. The company owns 658.22 foot-acres of solid coal, and 689.55 foot acres of pillar coal only two-

thirds of which, or 459.70 foot acres, is assessed for tax purposes. This makes a total of 1,117.92 foot acres subject to assessment, and at $240 per foot acre amounts to an assessed valuation of $268,300.80.

The decree is modified and the record remitted so that the court below may by order carry out the modifications set forth herein; costs to be paid by the county.