# UNITED STATES v. CERTAIN PARCELS OF LAND IN CITY OF PHILADELPHIA et al.

## No. 8234.

Circuit Court of Appeals, Third Circuit.
Argued Feb. 21, 1944.
Decided Aug. 16, 1944.

Thomas Raeburn White, of Philadelphia, Pa. (Edith H. West, C. Laurence Cushmore, Jr., and White & Staples, all of Philadelphia, Pa., on the brief), for appellant.

Wilma C. Martin, of Washington, D. C. (Norman M. Littell, Asst. Atty. Gen., Gerald A. Gleeson, U. S. Atty., of Philadelphia, Pa., C. James Todaro, Sp. Asst. to Atty. Gen., and Vernon L. Wilkinson, Attorneys, Department of Justice, of Washington, D. C., on the brief), for appellee.

Before MARIS and JONES, Circuit Judges, and BARD, District Judge.

BARD, District Judge.

This appeal raises a single question. In a case to determine the value of property taken by the United States under the power of eminent domain, is a written contract for the sale of the identical property executed shortly before the taking admissible in evidence as bearing on the market value of the property?

The trial court refused to receive into evidence such a contract offered by appellant-owner.

On August 25, 1941 the United States instituted proceedings to condemn certain parcels of land in the City of Philadelphia, among which was a tract of about 88 acres belonging to the appellant. A board of view was appointed, testimony was taken, and a report filed fixing the value of appellant's land. The United States was dissatisfied with the viewers' award and appealed therefrom. The case was tried in the district court before a jury which returned a verdict for the property owner in the amount of $64,162.50. This appeal by the owner followed.

The agreement offered was entered into on June 7, 1941 between the owner and the Northeast Park Realty Company for the sale of the property here involved for a total consideration of $82,768.75. The agreement of sale contained a plan for subdividing the land, which was unimproved and undeveloped, and called for periodic payments on account of the purchase price and periodic conveyances of various subdivided portions of the land as such payments were made. The total consideration was to be paid within twenty-five months of the execution of the agreement. The first payment by the buyer under the agreement was to have been made by July 7, 1941. On that date the parties agreed to extend the date of performance to July 25, 1941. On the latter date the parties met to make settlement and to make the first conveyance under the agreement. Counsel for the buyer arrived and said that he had received notice from the government that the land would be taken under the power of eminent domain and that his client should not proceed with the settlement.

Appellant urges that the trial court erred in holding that, under the law of Pennsylvania, evidence of the price at which a property has been sold is inadmissible in condemnation proceedings as proof of its value. He argues that Reinhold v. Ephrata Borough, 171 Pa. 425, 33 A. 362, relied upon by the trial court in its opinion, is not controlling on this question and that under other Pennsylvania authorities such evidence is admissible.

■ A careful consideration of the Pennsylvania authorities leads to the conclusion that such evidence is inadmissible under Pennsylvania law. While it is probably true that there is no Pennsylvania decision which squarely covers the present case, the results and reasoning of the most analogous cases are clearly hostile to the admission of evidence of the sale price of land taken by eminent domain. It has long been settled in Pennsylvania that evidence of the sale price of lands similar to the parcel condemned is inadmissible. Henkel v. Wabash Pittsburg Terminal R. R. Co., 213 Pa. 485, 62 A. 1085; Schonhardt v. Pennsylvania R. R. Co., 216 Pa. 224, 65 A. 543; Pennsylvania Co. for Insurances on Lives, etc., v. Philadelphia, 268 Pa. 559, 112 A. 76. The principal reason upon which this rule is based is significant because it is broad enough to be equally applicable to evidence of sales of the very property condemned. This reason is that "market value" in this type of case in Pennsylvania depends on the "judgment of the community" rather than that of a particular buyer and seller. In the early

case of East Pennsylvania Railroad v. Hiester, 40 Pa. 53, the Supreme Court of Pennsylvania, after pointing out that one objection to the admissibility of evidence of the sale price of similar land was the introduction of numerous collateral issues, continued at page 55 of 40 Pa.: "But even this is not the most serious objection. Such testimony does not disclose the public and general estimate which, in such cases, we have seen is a test of value. It would be as liable to be the result of fancy, caprice, or folly, as of sound judgment, in regard to the intrinsic worth of the subject-matter of it; and, consequently, would prove nothing on the point to be investigated. The fact as to what one man may have sold or received for his property, is certainly a collateral fact to an issue, involving what another should receive, and, if in no way connected with it, proves nothing. It is, therefore, irrelevant, improper, and dangerous. Not so with a market value. That is a recognized fair test. It holds good, let the demand and supply be as they may, and is equally reliable, whatever may be the relative value of money and property, or the circumstances of the country. It is supposed to represent the judgment of the community, and approximately fixes the value of a given article or thing, as it may do the character of a person."

Similarly, in Schonhardt v. Pennsylvania R. R. Co., 216 Pa. 224, at page 228, 65 A. 543, 544, the Supreme Court of Pennsylvania said: "The proper test of value when the whole property is taken is the market price, and this is to be shown, not by proof of particular sales, but by the general selling price."

And in Friday v. Pennsylvania R. Co., 204 Pa. 405, 54 A. 339, at page 408, the Supreme Court of Pennsylvania said: " * * * the general selling price is not to be shown by evidence of particular sales of alleged similar lots, but is to be fixed in the mind of the witness from a knowledge of the price at which lots are generally held for sale, and at which they are sometimes actually sold, in the course of ordinary business in the neighborhood."

We therefore accept the government's

contention that under the Pennsylvania concept of the market value of property in eminent domain proceedings, evidence of the price at which it was sold is not sufficiently relevant to be considered by the jury. This should be contrasted with the Pennsylvania concept of market value adopted in cases involving the proper assessment for purposes of taxation, in which it is recognized that "a previous sale of a property has a substantial bearing upon the question of market value." Hickey's Appeal, 326 Pa. 467, 192 A. 923, 924; Edmond's Appeal, 314 Pa. 382, 172 A. 103; see also Hudson Coal Company's Appeal, 327 Pa. 247, 193 A. 8; Kaemmerling's Appeal, 282 Pa. 78, 127 A. 439 (public sale); Sailer's Appeal, 120 Pa.Super. 69, 181 A. 854 (public sale).[1]

The question is presented, however, whether the Pennsylvania concept of value for purposes of eminent domain governs in a condemnation proceeding brought by the United States against land in Pennsylvania. This question was recently answered by the United States Supreme Court in United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55. In that case it was held that the owner of property condemned by the United States is not entitled to the benefit of any increment in the value of his property resulting from the fact that adjacent lands were condemned, regardless of whether such increment could be considered in determining value in condemnation proceedings under the law of the state in which the land was situated. Said Mr. Justice Roberts, speaking for the Court, at page 379 of 317 U.S., page 283 of 63 S.Ct., 87 L.Ed. 336, 147 A.L.R. 55: "The respondents also say that, whatever the criterion of value adopted by the federal courts, Congress has adopted the local rule followed in the state where the federal court sits; and they claim that the California rule is settled that fair market value at the date of taking is the standard of value, without elimination of any increment attributable to the action of the taker. We need not determine what is the local law, for the federal statutes upon which reliance is placed require only that, in condemna-

---

[1] The Pennsylvania Supreme Court's concept of the market value of property in eminent domain proceedings should apparently also be contrasted with its concept in cases fixing the fair market value of mortgaged premises which have been sold on foreclosure. In the recent case of Union National Bank v. Crump et al., 349 Pa. 339, 37 A.2d 733, the Court said that an offer to purchase has evidentiary value, though not conclusive, as to the fair market value of the property.

tion proceedings, a federal court shall adopt the forms and methods of procedure afforded by the law of the State in which the court sits. They do not, and could not, affect questions of substantive right,—such as the measure of compensation,—grounded upon the Constitution of the United States."

■ In an earlier part of the same opinion, the Supreme Court set forth at length the standard by which the amount of compensation due an owner of land condemned by the United States is to be determined. On pages 373, 374 of 317 U.S., on page 279 of 63 S.Ct., 87 L.Ed. 336, 147 A.L.R. 55, the Court said:

"The Fifth Amendment of the Constitution provides that private property shall not be taken for public use without just compensation. Such compensation means the full and perfect equivalent in money of the property taken. The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken.

"It is conceivable that an owner's indemnity should be measured in various ways depending upon the circumstances of each case and that no general formula should be used for the purpose. In an effort, however, to find some practical standard, the courts early adopted, and have retained, the concept of market value. The owner has been said to be entitled to the 'value', the 'market value', and the 'fair market value' of what is taken. The term 'fair' hardly adds anything to the phrase 'market value', which denotes what 'it fairly may be believed that a purchaser in fair market conditions would have given', or, more concisely, 'market value fairly determined'.

" * * * Where, for any reason, property has no market resort must be had to other data to ascertain its value; and, even in the ordinary case, assessment of market value involves the use of assumptions, which make it unlikely that the appraisal will reflect true value with nicety. It is usually said that market value is what a willing buyer would pay in cash to a willing seller. Where the property taken,

and that in its vicinity, has not in fact been sold within recent times, or in significant amounts, the application of this concept involves, at best, a guess by informed persons."

■ Under this concept of market value, set forth by the Supreme Court as the "practical standard" by which the constitutional requirement of just compensation to the owner of land taken by the United States for public use is determined, it would certainly appear that evidence of the sales price of the land in question is relevant and admissible. If the "owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken", it is difficult to see how the evidence offered in the instant case could fail to have important bearing in determining what that position is. And if market value, as construed in condemnation proceedings by the United States, is "what a willing buyer would pay in cash to a willing seller," evidence of what the property sold for in a bona fide sale is most significant. Indeed, substantially the same definition of market value has been adopted by the Pennsylvania Courts in tax assessment cases,[2] in which, as pointed out above, evidence of the sales price is recognized to be admissible and to have a substantial bearing on market value. It will thus be seen that it is a difference in the definition of the term "market value" in condemnation proceedings, and not merely a difference in the procedure[3] by which the elements of a commonly defined standard are proved, which renders evidence of the sale price relevant and admissible in condemnation proceedings in the federal courts and irrelevant and inadmissible in condemnation proceedings in the Pennsylvania court.

■ We are, therefore, of the opinion that the evidence of the terms of the contract of sale for the property condemned in the present case should have been received in evidence. It is evidence to be considered in arriving at just compensation, affecting the appellant's substantive right,

[2] Lehigh & Wilkes-Barre Coal Co.'s Assessment, 298 Pa. 294, 148 A. 301; Philadelphia & Reading Coal & Iron Co. v. Commissioner of Northumberland County, 323 Pa. 185, 186 A. 105; Hudson Co.'s Appeal, 327 Pa. 247, 193 A. 8; Algon Realty Co. Tax Assessment Appeal, 329 Pa. 321, 198 A. 49.

[3] The general condemnation act of August 1, 1888, 25 Stat. 357, 40 U.S.C.A. § 258, provides that in condemnation proceedings "the practice, pleadings, forms and modes of proceeding * * * shall conform, as near as may be, to the practice, pleadings, forms and proceedings existing at the time in like causes in the courts of record of the State within which such district court is held * * *."

and its relevancy is therefore a federal question to be determined unfettered by any local rule. It is true that the contract had not been consummated and that, as argued by the government, reception of such evidence makes it possible for a landowner, learning that condemnation of his property is likely, to enter into a collusive agreement of sale so as to manufacture evidence in support of an exorbitant claim. This danger is not to be minimized, particularly in view of the difficulty which might well be entailed in proving such collusion. Yet evidence of a bona fide sale, otherwise relevant, should not be excluded because of the possibility that some landowner might conspire with another to defraud the government by manufacturing collusive evidence. Such objections go to the weight of such evidence rather than to its admissibility, and the trial affords opportunity, both by cross-examination and comment to the jury, to bring such evidence to its proper perspective for the jury's consideration. The penalties of the criminal law also will afford a deterrent to such persons without depriving others of significant evidence of the value of their property in condemnation proceedings.

■■ It was further argued by appellee that the case was tried on the theory that Pennsylvania law was to be followed, and that the appellant may not on appeal rely on a different theory as to the controlling law. The record demonstrates that the case was unquestionably tried on the theory that Pennsylvania law was controlling and that all the authorities and arguments of the parties to the trial judge were made with respect only to the question of the admissibility of the proffered evidence under Pennsylvania law. Appellate courts of course have always remanded cases when the trial courts have applied the law of the wrong jurisdiction. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. We think this should be done in this case and it is immaterial that it was tried in the district court on the theory that Pennsylvania law was to be applied. The appropriate law must be applied in each case and upon a failure to do so appellate courts should remand the cause to the trial court to afford it opportunity to apply the appropriate law, even if the question was not raised in the court below. Pecheur Lozenge Co., Inc. v. National Candy Co., 315 U.S. 666, 62 S. Ct. 853, 86 L.Ed. 1103.

■ Appellee further contends that the evidence was properly rejected because it was for the purpose of "establishing a fair market value", and appellant cannot now contend that "it should have been admitted simply as evidence of market value." We agree that the contract of sale would not have been controlling on the question of market value but would have been merely evidence thereof. Cf. Olson v. United States, 292 U.S. 246, at page 255, 54 S.Ct. 704, at page 708, 78 L.Ed. 1236, wherein the court said: "That equivalent is the market value of the property at the time of the taking contemporaneously paid in money. Seaboard Air Line Ry. v. United States, 261 U.S. 299, 306, 43 S.Ct. 354, 67 L.Ed. 664; Jacobs v. United States, 290 U.S. 13, 17, 54 S.Ct. 26, 78 L.Ed. 142 [96 A.L.R. 1]; 2 Lewis, Eminent Domain (3rd Ed.) § 682, p. 1172. It may be more or less than the owner's investment. He may have acquired the property for less than its worth or he may have paid a speculative and exorbitant price. Its value may have changed substantially while held by him. The return yielded may have been greater or less than interest, taxes, and other carrying charges. The public may not by any means confiscate the benefits, or be required to bear the burden, of the owner's bargain."

■ But we do not agree that an offer of evidence to "establish" market value embodies the position that such evidence is conclusive of that issue, and certainly the trial court was neither misled by the language of the offer, nor did it base its rejection of the evidence on any such narrow ground.

■ Finally, appellee argues that since market value has been defined by the Supreme Court as what a willing buyer would pay a willing seller "in cash" for the property (United States v. Miller, supra, 317 U.S. at page 374, 63 S.Ct. at page 280, 87 L.Ed. 336, 147 A.L.R. 55), the offer to prove a contract of sale calling for payment of the purchase price over a 25 month period was properly rejected. There are numerous circumstances in which a jury must determine the present cash value of future sums of money, and this difficulty in the present case affords insufficient ground for excluding the proffered evidence.

The judgment is reversed and the cause is remanded.

JONES, Circuit Judge (dissenting).

The one question raised on this appeal is whether the trial court erred in rejecting, as evidence of the market value of the condemned property, the plaintiff's offer of a written instrument said to be an agreement for an antecedent sale of the subject property. I think the trial court's ruling accomplished the right result, but, for a different reason than that assigned by the court below.

Regardless of whether the law governing the admissibility of the evidence is the law of Pennsylvania (the situs of the condemned property),[1] as both the court and counsel conceived at trial, or whether, being a federal condemnation, the applicable rules are the rules supplied by federal law and that, under federal law,[2] proof of a relevant prior sales price for the condemned property is admissible as evidence of its market value, I fail to see how the writing offered by the plaintiff can possibly be considered an agreement of sale,— certainly not a sale for cash or any other definite value.

Reference to the proffered writing (Plaintiff's Exhibit 3) will disclose that, at most, it was no more than an option to the grantee to exploit the property by attempted sales thereof in lots according to a plan and schedule provided for in the agreement. While the agreement recited a consideration of $82,768.75, that sum represented, in reality, no more than the estimated aggregate to be derived by the owner from a sale by the optionee of all of the lots, *if and when* sold and paid for by the optionee at the unit price per lot fixed by the agreement. The agreement contained no promise or undertaking on the part of the optionee to pay the consideration or any part thereof except as it might sell lots from time to time and receive deeds therefor from the owner. No hand money was called for by the agreement nor was any paid by the optionee.

The undertaking of the optionee (a realty company) was that, within thirty days of the execution of the agreement, it or its nominee would pay to the owner $2,250, whereupon the owner would convey to the optionee or its nominee ten of the lots identified on the plan attached to the agreement as an exhibit. Within one hundred and ninety days of the execution of the agreement, the optionee or its nominee was to pay the owner an additional $2,250 and receive conveyances for ten more lots at the rate of $225 per lot which was the rate to be applied to the first eighty lots. The eighty-first lot was to be paid for at the price of $218.75; the next nineteen at $200 per lot; and the remainder of the lots (two hundred and forty-three) was to be paid for at the rate of $250 per lot. The agreement provided that the owner should be under no duty to execute or deliver a conveyance for less than ten lots at any one time and, then only, upon receiving the respective allocated payments.

Moreover, the lots were blocked in series, the blocks being identified alphabetically, and the optionee was required to sell all of the lots in Block A before it could sell any lots in Block B or any succeeding block and, thereafter, likewise with respect to each alphabetically succeeding block. Of the total of three hundred and forty-three lots in the plan, the optionee needed sell only seventy-five in the first thirteen months to keep the agreement in force although all were to be sold within twenty-five months.

If the optionee failed to sell lots according to the time schedule of the agreement or abandoned the undertaking, there was no obligation upon it to pay the owner anything on account of the property except the respective amounts due for the lots actually conveyed by the owner upon the optionee's sale thereof. For the optionee's failure to make the minimum payments for lots, in accordance with the schedule, the owner, at his option, could declare the agreement "insofar as not then executed" null and void and any interest of the optionee in the property not theretofore conveyed would thereupon cease and determine. No suit against the optionee for the contract price of the lots, if unsold, was maintainable and no damages for the optionee's failure to sell all of the lots was either liquidated or stipulated. The agreement further expressly provided that it was not to be recorded.

The foregoing would seem to be sufficient to indicate that the agreement was far less than an agreement by the owner to sell the property in question for cash or to a responsible purchaser for a definite, certain and fixed consideration. The agreement

[1] See Act of August 1, 1888, 25 Stat. 357, 40 U.S.C.A. § 258.

[2] Cf. United States v. Miller, 317 U.S. 369, 374, 375, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55.

632

would not have supported a bill for specific performance nor the equivalent, an action at law for a definite and fixed contract price for the land. In my opinion, the proffered agreement was not competent evidence, even under federal rules, of the market value of the property in question. If that is so, it logically follows that the trial court's rejection of the agreement was not error.

Of course, the credibility and weight of evidence is for the jury but, assuming that the jury accepted the agreement as verity and accorded it the fullest weight to which it could possibly be entitled, there would still remain the question as to the sufficiency of the evidence for the purpose for which it is offered. That is a question of law which it is the duty of the court to decide. Nor may it be answered by saying that the jury may give the evidence such weight as it thinks it merits. The jury may do that only if, first of all, the evidence is competent.

What standards, it may be asked, could the trial judge have possibly given the jury in order that it might appropriately discount the aggregate of the prices of all the lots if the optionee should fail to sell them all or any substantial part of them? Or, what discount of the aggregate prices to the owner for all the lots could the jury be told it might make if it found that the optionee, in order to obtain for less than a shoestring the privilege of trying to sell the land in lots, allocated to the owner a prospective share in the speculative values anticipated from a sale of the lots? Such a purchaser, free from any liability to himself, might well agree to a prospective ultimate realization by the owner from a sale of the lots several times what the latter could possibly obtain for the property, as a whole, from an outright sale thereof to a responsible buyer.

If matter of such character as the proffered writing in this case is to be deemed competent evidence of the market value of the subject property, it is not difficult to imagine the type of evidence with which condemners of private property for forecasted public uses will be met when they come to judicial determinations of the fair, reasonable and just compensation to which the owners of property are rightly entitled. Such owners are not entitled, however, to vague, uncertain and speculative values and, particularly not, to values which depend upon a special exploitation of the property as yet unexecuted and wholly undetermined as even a likely reality.

I should overrule the appellant's assignment of error and affirm the judgment of the District Court.