**UNITED STATES of America, Plaintiff-Appellant,**

v.

**428.02 ACRES OF LAND, MORE OR LESS, SITUATE IN NEWTON AND SEARCY COUNTIES, ARKANSAS, and Robert G. Patrick, et ux., et al., and Unknown Owners, Tract No. 49–115, Defendants-Appellees.**

No. 81–2243.

United States Court of Appeals, Eighth Circuit.

Submitted April 13, 1982.

Decided Sept. 3, 1982.

Donald J. Adams, Harrison, Ark., for defendants-appellees.

Carol E. Dinkins, Asst. Atty. Gen., Washington, D. C., Larry R. McCord, U. S. Atty., J. Michael Fitzhugh, Asst. U. S. Atty., Fort Smith, Ark., Edward J. Shawaker, Wendy B. Jacobs, Attys., Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Before ARNOLD, Circuit Judge, STEPHENSON, Senior Circuit Judge, and HANSON,* Senior District Judge.

HANSON, Senior District Judge.

This is a condemnation case in which the United States appeals one aspect of the judgment entered pursuant to the jury's verdict fixing the amount of just compensation for the taking of three parcels of property in Newton County, Arkansas. The award challenged on appeal is $110,000 for subterranean cave rights. The government's main contention is that the trial judge [1] abused his discretion in permitting valuation testimony by an appraiser based primarily upon an executory sales contract which the landowners entered into after passage of the legislation defining the scope of the government project and squarely placing the landowners' property within that scope. In addition, the government contends that the record fails to establish that the highest and best use of the cave is commercial development; thus, it is argued, the award is excessive. We affirm.

I.

The scenic Buffalo River meanders through northern Arkansas. In order to preserve its beauty, in 1972 Congress passed

---

* The Honorable William C. Hanson, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

1. The Honorable Paul X Williams, Senior United States District Judge for the Western District of Arkansas.

the Buffalo National River Act[2] [the Act]. Dean and Vida Hodgden owned three tracts of property in Newton County, Arkansas, that were located within the boundaries of the project as originally set out in the Act. Two wooded tracts of 40 acres and 77.48 acres and the cave comprised the Hodgdens' property. Pursuant to its authority under the Act, the government on August 6, 1980, filed a complaint in condemnation against this property. On August 17, 1981, and for three days thereafter, the issue of just compensation was tried to a jury. Ultimately, the jury valued the 40-acre tract at $18,000, the 77.48-acre tract at $28,500, and the cave at $110,000.

The government maintains that the trial judge abused his discretion in permitting the Hodgdens' appraisal witness to give valuation testimony based largely on an executory sales contract. The contract was for the sale of the three parcels of property herein condemned for a price of $250,000. It was entered into on February 25, 1979, seven years after the scope of the Buffalo National River project had been set by the Act and a year and a half before the condemnation proceedings were initiated. Under the terms of the contract, the purchasers, an oil man and a banker from Oklahoma, placed $25,000 in escrow with the balance of the $250,000 purchase price due February 25, 1980, one year from the contract date. The contract provided that it would be void if the government condemned the property within the year. Although condemnation proceedings were not begun within the year, the sale was never completed because the Hodgdens learned sometime before the contract payment date that their attempt to have their property released from the confines of the Buffalo National River was unsuccessful and that their case had been turned over to the Justice Department for initiation of a condemnation action.

Prior to permitting the introduction of any evidence about this contract, the trial judge held a hearing outside the presence of the jury as to its admissibility. The government argued that because the sale was never consummated, the contract was too speculative an indication of fair market value. In addition, the government argued that the contracting parties' awareness that the land was within the confines of the Buffalo National River may have resulted in a contract price which was inflated because of the property's inclusion within this government project. Any such inflated value is not to be considered in arriving at fair market value under the so-called "scope of the project" rule. The trial judge ruled that the questions raised by the government went to the weight of the evidence rather than to its admissibility and allowed evidence of the contract to be placed before the jury.

Subsequently, the Hodgdens' appraisal witness, Keith Schultz, testified as to the parties to the contract, its terms, and the date that it was entered into. The contract itself was never offered into evidence.[3] Schultz testified that the contract price was the best indication of the value of the cave. He arrived at this conclusion after surveying a number of other caves in the area and finding none of them to be comparable to the Hodgdens' cave, which is known as Beauty Cave. The other caves Schultz studied were all much smaller than Beauty Cave and were all developed to permit tourist traffic through them. After discounting developments, Schultz arrived at values ranging from $20,450 to $38,000 for these caves in their wild states. The evidence indicated, however, that Beauty Cave is in a class by itself in both its spectacular size and in the wondrous nature and quality of the formations that it contains. At least ten miles of passageways have been ex-

---

**2.** Pub.L. 92–237, 86 Stat. 45, 16 U.S.C. § 460m–8 et seq.

**3.** Cf. United States v. 320.0 Acres of Land, 605 F.2d 762, 798 n. 64 (5th Cir. 1979) (holding that comparable sales may be admitted either as substantive and direct proof of the value of the condemned property or to support the opinion of an expert testifying as to the value of the property taken); accord United States v. 1,129 Acres of Land, 473 F.2d 996, 998 (8th Cir. 1973).

plored by spelunkers who have discovered, among other features, rare gypsum needle and angel hair formations unmatched by any other cave in the United States. It was Schultz's opinion that the highest and best use of the cave was to develop it commercially as a tourist attraction. Apportioning the $250,000 contract price among the two wooded tracts and the cave, Schultz concluded that the cave was worth $194,000.

By contrast, the two government appraisers, Wesley Adams and Tom Reeder, rejected the contract as an indication of the fair market value of the cave. Adams opined that the cave was not capable of commercial development. He cited other caves that he investigated in attempting to determine the value of Beauty Cave, one of which he said sold for $58,000 excluding land and improvements. This cave was much smaller but more accessible to the public than Beauty Cave. Adams did not assign one value to the cave, but apportioned it among the three tracts of the Hodgdens' land under which it extended; the combined price amounted to an appraisal of $41,000. T. 243–46. Reeder concurred that commercial development of the cave was not feasible largely because of its location seven miles from the nearest paved highway. He applied the market approach in which sales of comparable properties are studied in determining the value of the property to be appraised and concluded that the fair market value of Beauty Cave was $35,475.

The government contends that the admission of evidence of the contract in support of Schultz's valuation testimony violated the scope of the project rule. The rule states that "if the condemned land was probably within the scope of the governmental project for which it is being condemned at the time the Government became committed to that project, then the owner is not entitled to any increment in value occasioned by the Government's undertaking the project." *United States v. 320.0 Acres, etc.*, 605 F.2d 762, 781–82 (5th Cir. 1979) *[Everglades]*. The rule represents a refinement by the Supreme Court of the principle that fair market value shall be the measure of the "just compensation"

that the Constitution mandates when private property is taken for a public use. *See United States v. Reynolds*, 397 U.S. 14, 15–16, 90 S.Ct. 803, 804–05, 25 L.Ed.2d 12 (1970). It was apparent to the Court that market value may be affected either adversely or favorably "by the imminence of the very public project that makes the condemnation necessary." *Id.* (footnote omitted). Hence, "to permit compensation to be either reduced or increased because of an alteration in market value attributable to the project itself would not lead to the 'just compensation' that the Constitution requires." *Id.* (footnote omitted). On the other hand, the Court has recognized that the market value of lands not within the scope of the original project but in close proximity to it may also be affected by virtue of the project. If such lands should later be taken by the government, "it must pay their market value as enhanced by this factor of proximity." *United States v. Miller*, 317 U.S. 369, 376, 63 S.Ct. 276, 281, 87 L.Ed. 336 (1943).

Undisputedly Beauty Cave was within the scope of the project as originally delineated in 1972 by the Act. Accordingly any increase or decrease in market value caused by the project must be discounted in determining fair market value. It is the government's position that because the parties explicitly acknowledged the possibility of condemnation in the contract, the contract price somehow must have been affected by this possibility. It is also suggested that the contract might have been the product of collusion between the parties in order to enhance any future condemnation award. Thus, according to the government, there was no other way to ensure against an impermissible enhancement of the just compensation award than to exclude totally any evidence of the executory sales contract.

The question becomes whether the Supreme Court-mandated substantive exclusion of increments of value attributable to the government project requires that an evidentiary exclusion be enforced against evidence of sales (or contracts for sale) of property which may reflect market values

impermissibly tainted by the government project. This problem was thoroughly treated by then Chief Judge Brown of the Fifth Circuit in the *Everglades* case, *supra*. Therein he concluded:

We have been unable to find any decisions in which an appellate court has squarely addressed the question and concluded that the SOP [scope of the project] rule requires an evidentiary exclusion. In their discussions of the substantive exclusion (no compensation for value attributable to the Government's special demand and its actions as condemnor), the Supreme Court's two major SOP decisions—*Miller* and *Reynolds*—contain no hint that an evidentiary exclusion is either necessary, or for that matter, proper.

*Id.* at 800 (footnote omitted).

In *Everglades*, the Fifth Circuit reversed a ruling by the trial court which excluded as evidence of fair market value all sales of coastal mangrove properties within the scope of the project (Everglades National Park) after the date when the boundaries of the park were set to include these properties. The court held that even though the market prices may have been impermissibly inflated by the existence of the park, a blanket evidentiary exclusion was an abuse of discretion because the excluded sales were the most comparable sales available in determining fair market value.

Thus, where an evidentiary exclusion would eliminate the "most comparable" sales available, the better course would be to admit the possibly tainted sales with appropriate instructions, permit the parties to present testimony pro and con regarding whether the sales are tainted and how much the taint distorts true market value, and then instruct the factfinder as to what elements of value must be included or excluded from the compensation award. The scope of the project rule commands only that *value* attributable to the Government's special demand and its actions as a condemnor be excluded from compensation .... It does not command that *evidence* be excluded. In many cases, the *substantive* exclusion can be accomplished as effectively through the use of proper instructions as it can through an evidentiary exclusion. And in some cases it is possible that *only* by the use of instructions can the substantive exclusion be given effect justly and fairly.

*Id.* at 802–3 (footnotes omitted) (emphasis in original).

Similarly, this circuit in general manifests a liberal view toward the admissibility of valuation evidence in condemnation cases.

In any condemnation case it is quite likely that some questionable evidence will get into the record and that some items of evidence are admissible for limited purposes only. The problem frequently, if not generally, can be taken care of by cautionary instructions given at the time the evidence comes in or in the course of final instructions given to the jury by the trial court, or by initial cautionary instructions followed by similar instructions in the court's final charge to the jury.

*United States v. 91.90 Acres of Land, etc.*, 586 F.2d 79, 89 (8th Cir. 1978), *cert. denied*, 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979). In particular, it has been held (as in the *Everglades* case) an abuse of discretion for a trial judge to adopt a per se exclusionary rule and thereby to exclude evidence of all comparable sales made subsequent to the date of the taking. *United States v. 1,129.-75 Acres of Land*, 473 F.2d 996, 998–99 (8th Cir. 1973); *accord United States v. 691.81 Acres of Land*, 443 F.2d 461, 462–63 (6th Cir. 1971); *United States v. 63.04 Acres of Land*, 245 F.2d 140, 144 (2d Cir. 1957). We emphasize that we are not holding that all such evidence must be admitted; the question of admissibility still resides in the sound discretion of the trial judge. We merely hold that when the trial judge effectively precludes all evidence of sales, or contracts for sale, of property that is comparable to the property being condemned, the ultimate goal of just compensation may be defeated. Accordingly, "[s]ound and just trial practice is to admit as many of the

'most comparable' sales available as is necessary to fairly permit each side to present its argument of fair market value for the jury's consideration." *Everglades, supra,* 605 F.2d at 798 (footnote omitted).

Nor are we convinced that any different rule should be applied regarding evidence of sales or contracts for sale of the very property that is the subject of the condemnation proceeding. In the area of comparable sales, comparability is said to be a function of the similarity of the characteristics of the properties, their geographic proximity, and the recency of the sale, or contract for sale. *Id.* at 798. It then follows that a recent sale of the very property to be condemned, provided that the sale is an unforced, arm's-length transaction, is extremely probative evidence of fair market value. *Cf. Hickey v. United States,* 208 F.2d 269, 273 (3d Cir.), *cert. denied,* 347 U.S. 919, 74 S.Ct. 519, 98 L.Ed. 1074 (1954) ("Recent sales of the very property condemned are entitled to considerable weight, but sales of similar property are entitled to weight also; and the relative importance of the two is dependent upon the facts in the particular condemnation proceeding.").[4]

As we have noted, the government suggests the possibility of collusion between the contracting parties for the purpose of inflating the value of any future condemnation award. The government points to the fact that the sale was never consummated as an indication that this was not a bona fide contract for sale. The Third Circuit was faced with an identical admissibility question in *United States v. Certain Parcels of Land, etc.,* 144 F.2d 626 (3d Cir. 1944). That court reasoned as follows:

It is true the contract had not been consummated and that, as argued by the government, reception of such evidence makes it possible for a landowner, learning that condemnation of his property is likely, to enter into a collusive agreement of sale so as to manufacture evidence in support of an exorbitant claim. This danger is not to be minimized, particularly in view of the difficulty which might well be entailed in proving such collusion. Yet evidence of a bona fide sale, otherwise relevant, should not be excluded because of the possibility that some landowner might conspire with another to defraud the government by manufacturing collusive evidence. Such objections go to the weight of such evidence rather than to its admissibility, and the trial affords opportunity, both by cross-examination and comment to the jury, to bring such evidence to its proper perspective for the jury's consideration. The penalties of the criminal law also will afford a deterrent to such persons without depriving others of significant evidence of the value of their property in condemnation proceedings.

*Id.* at 630. Thus, it was ruled that the evidence was admissible. *See also Surfside of Brevard, Inc. v. United States,* 414 F.2d 915 (5th Cir. 1969). We note that in the instant case, the government was given unrestrained latitude in the presentation of its case, through direct and cross-examination as well as comments to the jury, to attempt to place the contract in perspective.[5] Ultimately, however, the government raised nothing more than a "mere possibility" that the contract was not bona fide. For coming into court armed with nothing but specula-

---

**4.** This circuit has long recognized that evidence of past sales of the property to be condemned is admissible on the just compensation issue; even sales remote in time are admissible, remoteness going to the weight of the evidence rather than its admissibility. *United States v. Becktold Co.,* 129 F.2d 473, 479 (8th Cir. 1942); *see also United States v. Ham,* 187 F.2d 265, 269–70 (8th Cir. 1951).

**5.** On direct examination of its own appraisers, the government elicited that Wesley Adams did not consider the contract in making his ap-

praisal because, in his opinion, the terms and timing of the contract rendered it questionable whether the agreement was truly an arm's-length transaction. T. 233. By the same token, Tom Reeder testified that he did not consider the contract because "I never use contracts that are not finalized." T. 283. We note that neither of these appraisers contacted the purchasers under the contract in order to ascertain their motives for entering into the contract.

tion, the government has only itself to blame. The Hodgdens' attorney scheduled the taking of the depositions of the Oklahoma purchasers, but later cancelled them at the government's insistence. Proper use of pretrial discovery would have gone far in removing this issue from the realm of complete speculation.

In light of the foregoing principles, we hold that it was not an abuse of discretion for the trial judge to admit testimony about the executory sales contract in support of the appraiser Schultz's valuation testimony. The jury in this case was faced with a unique and difficult valuation problem in Beauty Cave. Even the government's appraisers were compelled to admit that none of the other caves in the Ozark region was comparable to Beauty Cave. Accordingly, a liberal view toward the admissibility of any and all evidence that would aid the fact finders in arriving at a fair market value would seem essential. Our review of the record in the case reveals no evidence regarding the effect the Buffalo National River project had on land values, either inflationary or deflationary. Nevertheless, the jury was instructed to disregard any value that could be attributable to the government's special demand for the property.[6] In addition, the trial judge properly permitted evidence pro and con regarding the usefulness of the sales contract as an indication of fair market value. Under these circumstances, no abuse of discretion is apparent.

## II.

■ The remaining issue raised by the government is that the award was excessive because the record fails to establish that the highest and best use of the cave is commercial development as a tourist attraction. It is a basic principle of eminent domain law that the condemnees are entitled to the value their properties would command on the open market in light of the highest and most profitable use to which they might reasonably be devoted in the near future. *Everglades, supra*, 605 F.2d at 811. Based on the authority it cites in support of its argument, the government appears to contend that the trial court erred in permitting evidence regarding commercial development on the issue of highest and best use.

■ It is established that in condemnation cases, the trial court must "screen the proffered potential uses and exclude from jury consideration those which have not been demonstrated to be practicable and reasonably probable uses." *United States v. 341.45 Acres of Land*, 633 F.2d 108, 111 (8th Cir. 1980), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981), *quoting Everglades, supra*, 605 F.2d at 815. If the government wished to exclude evidence of commercial development on the issue of highest and best use, then it was constrained to object to such evidence at trial; no objection was made, therefore no error was preserved for review.

■ Furthermore, even if objection had been made, our review of the record indicates that there was a "reasonable probability" that the cave was both physically adaptable for commercial use and that "there is a need or demand for such use in the reasonably near future." *United States v. 341.45 Acres of Land, supra*, 633 F.2d at 111. The cave is located in the midst of the Ozarks in northern Arkansas, an immensely popular summer vacation area where there are already a number of caves which are

---

6. The jury was instructed as follows:

So, in determining the fair market value at the time of taking, you are not to consider the fact that the Government has taken or plans or intends to take the land. Instead, you are to fix the fair market value on the date of, and at the time immediately before the taking, without regard either to any threat or imminence of the taking, or to the pendency of any plans or proceedings to take the land.

In determining the fair market value of the estate or interest taken, you may not consider the Government's need for the property, nor whether or not the defendant owner wanted to sell it. Your task is to find what was the fair market value of the tract involved in this trial, as of the time of taking, uninfluenced in any way by either the necessities of the Government or the wishes or wants or desires of the owner.

T. 330–31.

going concerns. Although the government offered evidence that a great deal of money would be required to convert Beauty Cave from its wild state,[7] there was evidence that the owners of one nearby cave, Blanchard Springs, spent between $12,000,000 and $15,000,000 converting their cave to accommodate tourists. Charles Craig, a spelunker, testified that he had extensively explored both Blanchard Springs and Beauty Cave and the amount of improvements that would have to be made in order for Beauty Cave to accommodate tourists "darn sure wouldn't be near as much as they did to Blanchard." T. 73. Therefore, there was evidence to support the view that Beauty Cave's highest and best use is as a commercially developed tourist attraction. *See Hembree v. United States*, 347 F.2d 109, 113 (8th Cir. 1965).

Finally, as to any argument that the jury award of $110,000 was just plain excessive, we disagree since the award was within the scope of the evidence; i.e., it was within the range of the experts' ultimate value opinions for the cave. *See United States v. 9.20 Acres of Land, More or Less*, 638 F.2d 1123, 1126 (8th Cir. 1981).

Accordingly, we affirm the judgment of the district court.

---

7. *E.g.*, Reeder estimated that it would cost $5,000,000 to pave a road from the highway seven miles to the cave entrance.