## Commonwealth v. Mellon National Bank & Trust Co.

*Edward T. Baker* and *Mark Yaskin,* Deputy Attorneys General, for Board of Finance and Revenue.

*Carl Chronister, Joseph G. Robinson* and *A. Sieber Hollinger,* for appellant.

KREIDER, J., May 29, 1964.—This is an appeal by defendant, Mellon National Bank and Trust Company, from the settlement of shares tax made against it for the year 1959 by the Commonwealth of Pennsylvania and from the refusal of the Board of Finance and Revenue to resettle said tax. Defendant's principal office is located in Pittsburgh, Pa. By agreement, this case was tried without a jury under the Act of April 22, 1874, P. L. 109. The evidence consisted of a stipulation of facts, various documents and the oral testimony of witnesses for defendant.

### Question Involved

The principal question for decision is whether the taxing officers of the Commonwealth in computing the taxable value of defendant's bank shares were correct in refusing to allow as a deduction the difference be-

tween the book value, unpaid principal balance, and the alleged fair market value of defendant's investments in Veterans' Administration (VA) guaranteed mortgage loans and Federal Housing Administration (FHA) insured mortgage loans as of December 31, 1959. . . .

### Discussion

The pertinent statute involved in this case is the Act of July 15, 1897, P. L. 292, as amended, 72 PS §1931, which imposes a tax on the actual value of the shares of capital stock of banks or savings institutions incorporated under any law of the Commonwealth or of the United States and located within the Commonwealth. Section 1 of the act requires, inter alia, that the Department of Revenue assess such shares for taxation for the calendar year which ended December 31, 1959, "at the rate of eight mills upon each dollar of the actual value thereof, the actual value of each share of stock to be ascertained and fixed by adding together the amount of capital stock paid in, the surplus, and undivided profits, and dividing this amount by the number of shares."

Defendant-bank contends that the taxing officers, in determining "actual value" must use market value. The Commonwealth, on the other hand, asserts that the proper test under the present circumstances is the book value or remaining unpaid principal balance of defendant's investment in the VA and FHA mortgage loans in question. In its specifications of objections, defendant claims that the "settlement" made by the Commonwealth's taxing officials violates the provisions of the Act of July 15, 1897, P. L. 292, as amended, and the due process and equal protection of the laws under sections 9 and 10 of article I and section 1 of article IX of the Constitution of the Commonwealth of Pennsylvania and of section 1 of the fourteenth amendment to the Constitution of the United States. It says this is

so because the taxing departments and the Board of Finance and Revenue, in determining the actual value of appellant's capital stock paid in, surplus and undivided profits for the year 1959, included the value of appellant's investments in VA and FHA mortgage loans at their book value of $75,708,372, rather than at their actual or market value of $63,210,184, on December 31, 1959, therefore by overstating by $12,498,-187 the actual value of appellant's bank shares.

The Commonwealth denies that there is a fair "market value" in the amount of $12,498,187, which the taxpayer seeks as a reduction, and contends that, even if there is a market for the particular types of mortgages in question, such market value is not the standard that is required to be used by the taxing officials in arriving at the actual value of defendant's bank shares. The Commonwealth points out that the taxpayer has not reduced the valuations of these mortgages on its books, that they are partially insured by the Federal Government, that the taxpayer intends to hold them until they mature and that during the year 1959 the taxpayer originated at face value a substantial number of the mortgages in question, knowing that there were quotations of sales of comparable mortgages in the alleged market at that time.

In its shares tax report for 1959, the Mellon National Bank and Trust Company reported the value of its taxable shares at $272,523,019.65. This amount included VA and FHA mortgages at an alleged "market value" of $63,210,184.69, which, as stated, was computed by deducting $12,498,187.32 from the unpaid principal balance of $75,708,372.01 due on these mortgages. *Thus the defendant appraised its VA and FHA mortgages as being worth only 84 percent of the face value thereof.* This deduction, which was disallowed by the Commonwealth on settlement, raises the principal issue in this case.

The difference of $12,498,187.32 between the book value, unpaid principal balance, and the alleged "fair market value" of the VA and FHA mortgage loans was based on an appraisal made for defendant by William F. Sey, President of J. Maxwell Pringle & Co., Inc. The Commonwealth, however, contends the evidence does not establish a nationwide market for VA and FHA mortgage loans of the types held by defendant and that the existence of any such "market" would not change the basic nature of such loans from mortgages to marketable securities.

As heretofore stated, the pivotal question is whether, under all the evidence in this case, "actual value" is synonymous with "market value." We think it is not. In Federal Deposit Ins. Corp. v. Board of Finance & Revenue, 61 Dauph. 431, 433 (1951), Judge Richards, in passing upon a petition for the refund of bank shares tax which averred that book value was erroneously used instead of actual market value, said:

". . . The tax is not levied on actual *market* value, but on actual value. . . ."

Both parties in the instant case cite two decisions of this court involving appeals by banks from the refusal of the Board of Finance and Revenue to review the settlement of a tax on the value of shares: Commonwealth v. Butler County National Bank, 64 Dauph. 82 (1952), exceptions dismissed 65 Dauph. 33, affirmed 376 Pa. 66 (1954); and Commonwealth v. First National Bank of Scranton, 63 Dauph. 298 (1952), exceptions dismissed 64 Dauph. 289, affirmed 378 Pa. 272 (1954). In each case the rules for the valuation of the type of assets involved were set forth and the Commonwealth was permitted to use the fair market value of certain securities in determining the actual value of the shares subject to tax. Defendant in the case at bar contends that the market value test should be applied to its mortgages and that the Commonwealth

is inconsistent in not adhering to the latter standard which it successfully invoked in the Butler and Scranton cases.

In the Butler case, one of the questions involved defendant bank's use of the book value of its securities in its "Shares Tax Report" as opposed to the higher market values used by the Commonwealth's taxing officers in settling the tax. The principal issue in Butler was whether unrealized appreciation on government, municipal and corporate bonds, both listed and unlisted, held for investment purposes should be included in determining the actual value of the bank's shares for taxation under the Act of July 15, 1897, P. L. 292, the unrealized appreciation being the difference between the cost of these securities as reflected on the books of the bank and the aggregate market value on the tax date, December 31, 1945. Judge, now President Judge, Sohn, who wrote the opinion in the Butler case, quoted from Commonwealth v. Union Trust of Pittsburgh, 237 Pa. 353, 357 (1912), where the Supreme Court discussed the duties of the Auditor General, then the State taxing officer, in determining the actual value of the shares, as follows:

". . . He must also follow the statutory method in determining the taxable value of the shares. This means in the present case that *the actual value* of each share must be determined upon the basis of the capital paid in, surplus and undivided profits; *but it does not mean* that the Auditor General must accept the book value, *or any other value,* reported by the officers of the company, as final and conclusive in determining the taxable value of the shares. . . ." [1]

In upholding the Commonwealth's settlement in the Butler County Bank case, supra, 376 Pa. 66, the Supreme Court of Pennsylvania, speaking through Mr.

---

[1] Emphasis throughout ours unless otherwise noted.

Justice, later Chief Justice, Charles Alvin Jones, said, at page 70:

". . . It may readily be conceded that the appellant bank used the most approved accounting practices in carrying *on its books* its investment securities at cost (with an allowance for possible losses), but the fact still remains that the appraisal of such investments at their *market* value contributes to a more truly *actual* valuation of the bank's capital shares. And, that is what the Act expressly taxes. Sound corporate accounting practices (especially for banking institutions) are not designed to show the *actual* worth of a bank's shares but rather their rock-bottom value, in short, the most conservative estimate possible." (Italics supplied by Supreme Court.)

In commenting upon the Dauphin County decision in that case, Mr. Justice Jones clearly pointed out that there is no hard and fast method to be applied in determining the actual value of bank shares, page 72:

"The thorough and well-reasoned opinion of Judge Sohn for the court below so effectively answers the appellant's effort to distinguish Commonwealth v. Union Trust Company, supra, that we can do no better than quote with approval therefrom: 'Appellant attempts to distinguish the case of Commonwealth v. Union Trust Co., 237 Pa. 353, from the case at bar by arguing . . . that [it] . . . is authority only for a valuation of bond investments at face value. In that case, *valuation* of securities *at face value was approved* by the court as a proper exercise of the power of taxing authorities to fix actual value of assets. Nothing said in that case militates against valuation on a basis other than face value. Merely because officials of the Commonwealth at one time fixed the actual value of bond investments at their face value and the court affirmed such action as proper, the fiscal officers are not impliedly barred thereby from fixing the actual value of

different securities at a different time at their market value.' "

In the Scranton bank case this court also approved the position taken by the Commonwealth that the unrealized appreciation on bond investments, being the difference between the market value and the face value as of December 31st of the tax year, should be included in determining the actual value of the bank's shares. In that case, 63 Dauph. 298, supra, Judge Sohn in speaking for this court, stated, page 304:

". . . So long as the determination of *actual value* of an asset at a given date is based on *facts and reasonable indicia of material worth*, the action of the Department of Revenue will not be disturbed. As this court said in Commonwealth v. Provident Trust Co., 55 Dauphin 235, 248:

" 'We must start with the proposition that the fiscal officers are required to ascertain "the actual value" of the shares. In endeavoring to ascertain it, *they must take into consideration whatever elements fairly contribute to that end. They are not bound to rely upon market value.* But neither should they disregard market value.

" 'In Algon Realty Co. Tax Assessment Appeal, 329 Pa. 321, 323, it is said, as to actual value: "This means nothing more or less than market value." See Hudson Coal Company's Appeal, 327 Pa. 247.

" 'Furthermore, the company's officers are required to make an appraisement. Such appraisement is intended to furnish a basis to the taxing officers. It is not conclusively binding, but it, in turn, should not be ignored.

" 'Nor are they required to place emphasis upon the estimate of an independent appraiser. Yet here again, such appraisals should be taken into consideration.' " (Italics supplied.)

It is true that in the Butler and Scranton bank cases

this court and the Supreme Court approved a fair market valuation of certain securities, not VA and FHA mortgages, in determining the actual value of bank shares. In the instant case the defendant contends in effect that because that method was applied in those cases it must necessarily be applied in this case. We cannot agree that such a result must follow.

An analysis of the decisions indicates that there is no fixed, rigid standard which invariably must be applied in determining "actual value." As above stated by this court and the Supreme Court, the taxing officers in determining actual value "are not bound to rely upon market value or any other value reported by the officers of the company, as final and conclusive in determining the taxable value of the shares." Moreover, in arriving at the actual value, all that need be properly considered are "facts and reasonable indicia of material worth."

We think the action of the taxing officers in the instant case was based upon facts and reasonable indicia of the material worth of the VA and FHA mortgages in question as of December 31, 1959. The taxing officials in exercising their considered judgment as to "actual value" were entitled to take into consideration the sound history of all of these mortgages and also the stamp of approval which the defendant bank apparently had placed upon them. This was recognized by the appellant's witness, Mr. Sey, when he described the methods he used in valuating the mortgages in question. He testified:

". . . What we normally would do if a bank such as Mellon Bank had these loans in their portfolio, we are also reasonably well acquainted with Mellon's requirements before they make or purchase a mortgage, we think we know that they are certainly reasonably good quality mortgages which would be accepted in the market by the average investor. . . ."

With respect to the three and one-half million dollars worth of mortgages purchased by appellant from two banks in 1954, the language of our Supreme Court in Commonwealth v. Union Trust Company of Pittsburgh, supra, 237 Pa. 353 (1912), seems appropriate here, page 358:

". . . if the funds were invested in securities worth their face value, no difficulty would arise. But where as in the present case good securities were purchased for much less than their face value for investment account, and carried as such, a different question is presented. . . . The report shows that the appellee company considered the securities worth what the Auditor General found their value to be, and it looks like a mere quibble in the administration of tax laws to say that securities representing undivided profits should be taxed at two million dollars less than their reported value in the tax year because the trust company had made a good bargain in purchasing them for less than their face value. . . ."

We are not convinced, moreover, by the appellant's argument with respect to its VA and FHA mortgages in the amount of about seventy-one and one-half million dollars *which it originated* by lending its own funds to its borrower-customers for the full face amount of the mortgages. These, as above stated, are partially guaranteed or insured by the United States Government. In our judgment *it is unrealistic to claim that as of December 31, 1959*, they were worth only 84 percent of their book, unpaid principal balance, value. Our conclusion is substantiated by the admitted facts as set forth in the following paragraphs of the stipulation of facts:

"14.(d) With respect to the *purchased* VA and FHA mortgages described above, the defendant *never* had occasion *to foreclose* on *any* of them. Foreclosures on mortgage loans *originated* by defendant to date rep-

resent .000344 of all of defendant's VA and FHA mortgage loans as of December 31, 1959.

"18. None of the VA and FHA mortgages purchased or originated by the defendant were sold in the years 1959, 1960 or 1961 nor, save in exceptional circumstances, is it the policy of the defendant to sell any of such purchased mortgages at any time. The VA and FHA mortgages purchased by defendant were purchased for investment purposes and to establish customer good will and in some instances were acquired as the result of defendant's purchase of the assets of a bank in whose portfolio of investments VA and FHA mortgages were present.

"20. During the year 1959, defendant *originated* 469 VA and FHA mortgage loans in the aggregate amount of $5,410,000, which are included in the remaining unpaid principal balance of VA and FHA mortgage loans of $75,708,372.01 as of December 31, 1959."

The only value relied upon by defendant is a so-called "market value" which varies in response to the fluctuation in rates of interest on obligations of the United States Government. None of the witnesses called by the defendant to show the marketability of VA and FHA mortgages throughout the United States had made an actual appraisement of the specific VA and FHA mortgages set forth in schedule 6 of defendant's shares tax report (Stip. of Facts, Ex. E), nor had they knowledge of the credit rating of any of the borrowers or the condition of the properties. While defendant's witnesses had some general knowledge of the various sections of the United States in which the mortgaged properties are located, such knowledge appears to have been confined to Statewide or regional areas but not to the specific location in question.

Defendant's shares tax report, as stipulated, showed that the book value or remaining unpaid principal bal-

ance of defendant's investment in VA and FHA mortgage loans was $75,708,372.01, and that their so-called "fair market value" as appraised by Mr. Sey was $63,210,184.69. However, at the trial it developed that this appraisal was in error, for two reasons: (1) There had been an inadvertent transposition of figures, and (2) a commission of one-half of one percent as a service charge had been included, which resulted in the defendant revising its figure upward to $64,367,720.36.

Despite the fact that the defendant's witnesses are undoubtedly well versed in the VA and FHA mortgage field, we feel they were not afforded an opportunity to make a thorough valuation of the specific mortgages in question and consequently, despite defendant's contention that such procedure was not required, we are constrained to find that their conclusion as to "actual value" is not supported by the evidence, particularly in light of the sound record of the mortgages in question.

We think defendant cannot expend its funds by making loans to its customers, as it did in the 1959 tax year, for the full face amount of the mortgages originated by it, and then assert in effect in its Shares Tax Report that these mortgages were worth only 84 percent of the amount defendant paid for them. Defendant's reply brief states that the question "is not how much the defendant will have received upon maturity for these mortgages, but what was their material worth to defendant as of December 31, 1959. . . ." However, the positive evidence of the face amounts loaned out by the defendant in originating these mortgages is persuasive of defendant's own estimate of their actual value. In view of the circumstances, we are unable to see how defendant can successfully contend that it made an excessive payment for the mortgages in question.

It may be noted, moreover, that mortgages generally are considered to be worth their face value for personal property tax purposes, unless the mortgagee can

show that the mortgage was bad. In County of Perry v. Troutman, 144 Pa. 361, 364 (1891), the court said:

". . . *Individual mortgages, money in the hands of solvent debtors, etc., are ordinarily, indeed we think universally, valued at their face.* The actual value of an individual mortgage, or of an obligation for money in the hands of a solvent debtor, is presumptively its face value. If the mortgage is bad, or the obligor is not solvent, the debt is not taxable; if, on the contrary, they are good, the common experience of business men is that the face value is the actual value ascertained in the ordinary modes of assessment." (citing cases.)

See also Crawford's Appeal, 19 D. & C. 147, 149 (1932), Venango Co. There the court, speaking through President Judge Harvey, specially presiding, stated:

". . . If the mortgaged property, or other property which might be secured by lien through the accompanying bond, and/or the personal worth of W. J. James, singly or together, secured the debt, then this mortgage should be returned for taxation purposes at its full face value. . . ."

*The Commonwealth's "Cross Appeal"*

Pursuant to section 1104 of The Fiscal Code of Pennsylvania, 72 PS §1104, the Commonwealth notified defendant that at the trial and argument of defendant's appeal it would raise the following additional question: [2]

---

[2] Section 1104 of The Fiscal Code provides:

"The Commonwealth may raise any question on appeal, although no appeal has been filed by it, and may introduce any facts in support of its settlement or in correction thereof, provided notice of twenty (20) days is given the appellant prior to trial of the intention of raising such new questions or presenting new facts."

On November 30, 1962 the appellant stipulated that it waived all objections to the timeliness of the Commonwealth's Cross Appeal which was not filed within the statutory period, the trial date being December 5, 1962.

"The defendant is not entitled to a deduction in the amount of $137,638.93 allowed by the Commonwealth's taxing officers in computing the taxpayer's bank shares tax valuation, which amount was carried by the defendant in an account entitled 'Discount on Real Estate Loans' in its banks shares tax report for the year 1959, in Schedule 5 thereof, as 'Other Liabilities'."

In its shares tax report, as stated, defendant reported $75,708,372.01 in VA and FHA mortgage loans, most of them originated by the defendant, but 568 obtained from other banks. *All* of these mortgages were carried as assets on the defendant's books at their unpaid principal balance. With respect to the mortgages *originated* by defendant, there was no offsetting liability or reserve on the defendant's books to reduce their values, but as to the 568 individual VA and FHA mortgage loans *not originated* by defendant, there was an offsetting liability of "unearned mortgage discount" in the amount of $137,638.93, representing the aggregate discount charged on the $3,631,320 of remaining unpaid principal balance of VA and FHA mortgage loans purchased from others. The Commonwealth and defendant have stipulated:

"Since the amount of $137,638.93 was not added back to the defendant's capital stock paid in, surplus and undivided profits by the taxing officers in making settlement of defendant's 1959 shares tax, it is agreed that the $12,498,187.32 difference between the book value and the market value of defendant's VA and FHA mortgage loans as appraised by J. Maxwell Prinfile & Co., Inc. should be reduced by $137,638.93 with resulting depreciation of $12,360,549.39. . . ."

However, the Commonwealth in its "Cross Appeal" takes the further position that the item "Discount on Real Estate Loans" in the amount of $137,638.93 is not a liability of defendant and, therefore, should be added back in computing the actual value of defendant's capi-

tal stock paid in, surplus and undivided profits. The Commonwealth claims that this discount was not an accurate or acceptable factor in measuring the actual value of these mortgages, because it was not adjusted downward as the maturity dates approached, and there were no foreclosures on any of these mortgages purchased at a discount. Defendant alleges that its accounting methods were in conformity with the requirements of Regulation 2765 of the Comptroller of the Currency.[3]

The Commonwealth says defendant might have been justified in following the regulation of the Comptroller of the Currency if it had placed these purchased mortgages on its books at the unpaid balance with an appropriate off-set for unearned discount, and taken the unearned discount into an earnings account in equal installments over the life of the loan.

Instead of doing this, the Commonwealth asserts that the defendant set up a liability account and did *not* take the unearned discount into earnings in equal installments over the life of the loan. Therefore, the Commonwealth contends the books of the defendant cannot be a determinative factor as to the unearned discount and the taxing officers exercised reasonable judgment in taxing these 568 mortgage loans at their face value, the amounts ultimately to be received. We

---

[3] "Regulations—Comptroller of Currency

"2765. FHA-Insured or VA-Guaranteed Real Estate Loans Purchased at a Discount.

"A national bank which purchases at a discount FHA-insured mortgage loans or mortgage loans guaranteed by the Veterans Administration may carry such loans on its books either (1) at cost price, or (2) at the amount of unpaid balance. If carried at the amount of unpaid balance, an appropriate offset to the amount of unearned discount should be an account such as 'Uncollected discount on real estate loans'. As the discount is earned, it may be taken into an earnings account such as "Interest and discount on loans" in equal installments over the life of the loan."

believe the Commonwealth's position in this regard is correct and should prevail. Defendant, in resisting the Commonwealth's attempt to impose tax on the discount of $137,638.93, asserts that this points up the alleged illogical and inequitable result, as well as the lack of uniformity in taxing the shares of banks, which would result from the Commonwealth's formula for taxing these mortgage investments. Defendant has agreed, however, that if this court approves the Commonwealth's formula which employs in this case the book value of these VA and FHA mortgages rather than their "market" value, then the $137,638.93 should be added back to the value of defendant's capital stock paid in, surplus and undivided profits, in determining the actual value of the defendant's bank shares, as suggested in the Commonwealth's requests for conclusions of law no. 10. We are of the opinion that this should be done.

### Conclusions of Law

1. The taxing officers of the Commonwealth properly valued VA and FHA mortgage loans of defendant at face value, in the same manner as other mortgage loans were valued.

2. The universal method of valuing mortgages is at their face value, unless it can be established that the mortgaged property, other property under a lien through the accompanying bond, and/or the personal worth of the mortgagor, singly or together, are not sufficient security for the debt.

3. The proper method for the valuation for bank shares tax purposes of loans, discounts, mortgages and judgments is either to appraise the validity of each loan, or to offset a five-year average loss reserve; and this rule also applies to VA and FHA mortgages held by the bank.

4. The VA and FHA mortgages originated by defendant are worth the amounts paid by defendant for

them and the amount to be received by the defendant from them.

5. Defendant's Federally guaranteed VA and FHA mortgage loans cannot be valued at only 84 percent of the principal balance, when all other mortgage loans are valued at slightly under 100 percent of their principal balance.

6. Defendant's VA and FHA mortgages differ from its portfolio of marketable securities for many reasons, e.g., such mortgages are held to maturity by the defendant, and their "market value" is dependent to some extent upon geographical location, and the Federal Government is not the borrower, but the guarantor to a limited extent.

7. The evidence does not establish that there existed a market which reflected the actual value of the VA and FHA mortgage loans held by defendant on December 31, 1959, nor would the existence of a "market" as described by defendant's witnesses change the basic nature of such loans from mortgages to marketable securities.

8. The evidence does not prove the relationship between the so-called appraisal reported by defendant on schedule 6, and the activities of Mr. Sey, who was allegedly familiar with the "market value" of VA and FHA mortgages as of December 31, 1959.

9. Defendant erred in reducing the reported value of certain VA and FHA mortgages purchased prior to 1959 and having a face value as of December 31, 1959, of $3,531,320, by subtracting therefrom, under "Other Liabilities—Schedule 5" the amount of $137,638.93, identified as "Discount on Real Estate Loans" (stip. of facts 14 and 15), and said sum of $137,638.93 must be added back to the value of defendant's capital stock paid in, surplus and undivided profits, in computing defendants shares tax.

10. The shares tax of defendant, Mellon National Bank and Trust Company, for the year ending December 31, 1959, should be computed as follows:

| | |
|---|---:|
| Actual value of shares per settlement | $306,075,259. |
| Add: Discounts on Real Estate Loans | 137,639. |
| | |
| Revised Actual value of shares | $306,212,898. |
| Outstanding Shares 2,558,344 | |
| Taxable Value per share of Common Stock 119.69 | |
| Less: Exempt Shares 182,222 x 119.69 = | 21,810,151. |
| | |
| Actual Value subject to tax | $284,402,747. |
| Tax at the rate of 8 mills | 2,275,221.98 |
| Tax paid 3-13-61 | 2,181,336.78 |
| | |
| Balance due Commonwealth | $93,885.20 |

## Order

And now, May 29, 1964, the appeal of Mellon National Bank and Trust Company is dismissed and the cross appeal of the Commonwealth is sustained. Judgment is directed to be entered in favor of the Commonwealth and against defendant for shares tax for the year ending December 31, 1959, in the principal amount of $2,275,221.98, with the allowance of a credit thereon in the principal amount of $2,181,336.78 heretofore paid by defendant, together with interest on the unpaid principal balance of $93,885.20 for the period from April 15, 1960, until date of payment [interest of $119,047.20 having already been paid on the $2,181,-336.78 payment].