633 F.2d 108
 7 Fed. R. Evid. Serv. 829
 UNITED STATES of America, Appellant,
v.
341.45 ACRES OF LAND, MORE OR LESS, LOCATED IN the COUNTY OF
ST. LOUIS, STATE OF MINNESOTA, Edward H. Essling et al.,
Edna K. Bassett, Appellee.
UNITED STATES of America, Appellant,
v.
341.45 ACRES OF LAND, MORE OR LESS, LOCATED IN the COUNTY OF
ST. LOUIS, STATE OF MINNESOTA, Edward M. Essling, et al.,
Paul Edward Essling, Administrator of the Estate of Edward
M. Essling, deceased, Appellee.
 Nos. 79-2075, 79-2083.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 9, 1980.
Decided Oct. 27, 1980.
Rehearing and Rehearing En Banc Denied Dec. 4, 1980.
 
 Anthony C. Liotta, Deputy Asst. Atty. Gen., Washington, D. C., Thomas K. Berg, U. S. Atty., John M. Lee, Asst. U. S. Atty., Minneapolis, Minn., Jacques B. Gelin, Thomas H. Pacheco, Attys., Dept. of Justice, Washington, D. C., for appellant.
 David Essling, St. Paul, Minn., for appellees.
 Before BRIGHT, ROSS and STEPHENSON, Circuit Judges.
 ROSS, Circuit Judge.
 
 
 1
 The United States appeals two condemnation judgments totaling $298,580 resulting from a jury verdict in a condemnation case involving land located in Voyageurs National Park in northern Minnesota. We conclude that the district court[1] erred in admitting evidence regarding the highest and best use of the land and therefore we reverse and remand for a new trial.
 
 
 2
 In 1971, Congress authorized condemnation of certain lands for the establishment of Voyageurs National Park. The land within the park, of concern in these appeals, is owned by Edna Bassett and Paul Essling. The jury awarded $232,480 for the Bassett land. The land consists of approximately 60 acres of mainland located on Lake Kabetogama and an unimproved island of approximately 1.5 acres on the same lake. The 60 acres of mainland consists of basically two parcels of land. The first parcel of approximately 20 acres is located on the shore of Lake Kabetogama and is bordered on the north by Gold Portage River which is approximately 100 feet wide. The first parcel is joined on its northwestern corner by the second parcel of approximately 40 acres. The second parcel does not front on the lake; however, the Gold Portage River runs through the middle of the parcel. Access to the land is approximately two miles by boat and the nearest road is two to two and one half miles from the land. On the 20-acre parcel there are a few abandoned buildings which were used for a boys' camp. Other than these buildings the land is unimproved and no efforts have been made toward subdivision of the land.
 
 
 3
 At trial the landowners' appraisers testified that the highest and best use of the land was as a residential recreational subdivision. Gary Hawkinson, one of the landowners' appraisers, testified at length concerning two different methods that could be used to subdivide the complete 60-acre parcel and island into lots. The plans and proposed plats showed that the property could be divided into either 42 or 24 lots. "Plan 2" called for 42 lots, including 21 lots that would not front on either the lake or the river. "Plan 1" consisted of 24 lots; approximately 16 of the lots would have river frontage while the balance would have lake frontage.
 
 
 4
 The government objected to testimony concerning subdivision of the land as "lacking foundation as to marketability, as to feasibility, and as being speculative and conjectural." The trial judge stated that "the jury will have to decide whether or not they believe that property is as valuable as this man says it is by virtue of the fact that he has indicated it can be subdivided in this way." Hawkinson valued the 60-acre tract and 1.5 acre island at $275,000. Victor Vik, another appraiser for the landowners, valued the land as a residential recreational subdivision at $297,000. The government's appraiser, Douglas Fruen, testified that the highest and best use of the 20-acre parcel was as single-family residential recreational development or cabin sites. However, in contrast, Fruen testified that the highest and best use of the 40-acre parcel was as timberland. Fruen valued the total Bassett land at $76,600.
 
 
 5
 Hawkinson also testified as to the costs of developing the Bassett land under both Plans 1 and 2. Hawkinson testified that his cost deduction under Plan 1 was $32,000 and under Plan 2 was $46,000. Hawkinson and other of landowners' witnesses testified concerning the costs of subdividing, developing and marketing the 60-acre tract.
 
 
 6
 The jury awarded $56,100 for the Essling land. The land consists of 23.75 acres of unimproved land located on an inlet which leads from Grassy Bay to Staege Bay. The property has approximately 660 feet of waterfront along the inlet which measures from 100 to 250 feet in width in front of the tract. The nearest road is 6 to 9 miles from the land and access by boat is a trip of 7 to 8 miles.
 
 
 7
 Hawkinson testified that the highest and best use of the Essling tract was as a recreational condominium development[2] and placed the value of the tract at $81,000. Hawkinson submitted two different condominium plans for the 23.75 acres, each of which proposed 24 units on the site. Some evidence regarding the costs of "trails" and a sewer system was also introduced.
 
 
 8
 The government objected to the introduction of the condominium plans as lacking "a foundation for any demand for condominiums in the area" and as lacking "foundation as to feasibility, marketability, compliance with applicable health and zoning regulations, speculative and conjectural." These objections were overruled.
 
 
 9
 The government's appraiser, Fruen, testified that the highest and best use for the Essling land was as sites for one to three cabins and valued the land at $16,500.
 
 
 10
 I. Admissibility of Evidence of Highest and Best Use
 
 
 11
 The government argues that the district court erred in not excluding as speculative and remote the evidence that the highest and best use of the land was as a subdivision and for condominiums.
 
 
 12
 In Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236 (1934) the Supreme Court stated:Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined. The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held.
 
 
 13
 Id. at 255, 54 S.Ct. at 708 (emphasis added) (citations omitted).
 
 
 14
 The Supreme Court in Olson also noted that "physical adaptability alone" for a certain use "cannot be deemed to affect market value." Id. at 256, 54 S.Ct. at 709. Olson cautions that:
 
 
 15
 Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value-a thing to be condemned in business transactions as well as in judicial ascertainment of truth.
 
 
 16
 Id. at 257, 54 S.Ct. at 709 (citations omitted).
 
 
 17
 Thus, Olson teaches that a proposed "use" requires a showing of reasonable probability that the land is both physically adaptable for such use and that there is a need or demand for such use in the reasonably near future.
 
 
 18
 Our concern in this case is whether the landowners established that the proffered uses of the land were reasonably probable so as to avoid mere speculation and conjecture. The trial judge believed that the jury could decide whether subdivision of the property would be feasible and whether there would be a demand for such lots. There was no preliminary review of the potential use evidence prior to its admission by the trial court.
 
 
 19
 The Fifth Circuit in United States v. 320.0 Acres, County of Monroe, Fla. (Monroe), 605 F.2d 762 (5th Cir. 1979), found that "(a)t the very least" it is the responsibility of the trial judge "under Rule 71A(h) (FED.R.CIV.P.) to screen the proffered potential uses and exclude from jury consideration those which have not been demonstrated to be practicable and reasonably probable uses." Id. at 815. We recognize as did the court in Monroe that there is authority for the proposition that the trial judge should actually determine the highest and best use issue. The Supreme Court has stated that Rule 71A(h) "provides that, except for the single issue of just compensation, the trial judge is to decide all issues, legal and factual, that may be presented." United States v. Reynolds, 397 U.S. 14, 19, 90 S.Ct. 803, 806, 25 L.Ed.2d 12 (1970). Reynolds established that a "scope-of-the-project" issue was a decision for the trial judge and not the jury. Id. at 20, 90 S.Ct. at 807. The Fifth Circuit in Monroe found that the issue of highest and best use could not be characterized as a "preliminary issue" as was the "scope-of-the-project" issue in Reynolds and thus declined to hold that the highest and best use issue was solely for the judge. Monroe, supra, 605 F.2d at 817. We agree with the reasoning of the Fifth Circuit in Monroe and therefore apply the standards of Monroe to the admission of the highest and best "use" evidence.
 
 
 20
 First, the trial judge should screen the evidence concerning potential uses. Monroe, supra, 605 F.2d at 815. Then, the trial judge should decide whether "the landowner has produced credible evidence that a potential use is reasonably practicable and reasonably probable within the near future * * *." If credible evidence of the potential use is produced, the jury then decides "whether the property's suitability for this use enhances its market value, and, if so, by how much." Monroe, supra, 605 F.2d at 817.
 
 
 21
 The trial judge's screening of the evidence does not require an extensive and detailed review of all the evidence. Rather, the judge need only find that there is credible evidence that the property is adaptable to the use and that there will be a need or demand for such use in the near future. See also United States v. 478.34 Acres (Cook), 578 F.2d 156, 159-60 (6th Cir. 1978).
 
 
 22
 After reviewing the trial transcript and exhibits in this case, we find that the landowners' evidence regarding need or demand in the near future for the proposed uses is less than credible. Although there was controverted testimony regarding the physical adaptability of the property to these uses, i. e., zoning, sewer requirements, we will assume for the purpose of this appeal that physical adaptability was established. Thus, we assume, without deciding, that the Bassett land could be subdivided and developed as proposed and that the Essling land could be developed with condominiums. However, as noted in Olson, physical adaptability of the land to a proposed use does not end the inquiry. The landowners are also required to introduce credible evidence that there is or will be a demand for the proposed use in the reasonably near future. It is this evidence of demand for the proposed use in the near future which we find lacking in this case.
 
 II. Subdivision of the Bassett Land
 
 23
 Regarding the plans for subdivision of the Bassett property, Hawkinson was asked if he was aware of any subdivisions in the area without road access which had back lots which had been sold. Hawkinson replied: "Not right offhand, because it's been the trend to just develop the lake front property." Vik testified that the majority of construction had been on waterfront. The only construction Vik noted as not on waterfront were cabins at certain resorts which were about 350 feet from the lake. Fruen testified that the time for development of the Bassett land without a lake view would not arrive until all the other lakeshore property had been developed.
 
 
 24
 The landowner also submitted numerous plats of both government and private subdivisions. These plats establish that the vast majority of subdivisions in the area surrounding the park are located on lakefront property. The "comparable sales" identified by the landowners' appraisers were of mainly platted lots or islands. However, none of these sales of platted lots involved property which either fronted on a river rather than a lake or involved lots which did not have any waterfront.
 
 
 25
 The record simply does not contain any credible evidence that there is an actual demand for riverfront or back lots or that such demand will occur in the reasonably near future. The proposed subdivisions for the Bassett land included many lots which either were riverfront lots or lots without any waterfront. Therefore, we find that the district court erred in admitting evidence that the approximately 40-acre tract through which the Gold Portage River runs could be subdivided. See United States v. 47.3096 Acres In Oxford Township, Erie Co., Ohio (DeChant), 583 F.2d 270, 272 (6th Cir. 1978), and United States v. 2,635.04 Acres, Allen and Barren Cos., Ky. (Berry), 336 F.2d 646, 648 (6th Cir. 1964).
 
 
 26
 The 20-acre tract with lakefront may be suitable for subdivision if credible evidence shows a demand by developers for such property. However, Hawkinson's "Plan 2" called for a number of back lots on the 20-acre tract and there is no evidence in the record establishing a market for such lots. To credibly establish demand for such lots, we believe that more than a few sporadic sales of such lots are necessary. Rather, there must be some evidence that others have developed and sold such lots, so as to establish a trend, at least, toward that type of development of lakefront property. We recognize that the land adjacent to this property has been stifled in its development due to the park. But, it also seems apparent that the park, itself, has for the last ten years increased the demand for surrounding lake property. Thus, if there is an actual demand for back lots or riverfront lots we believe the landowners will be able to show such demand.
 
 
 27
 III. Condominium Development of the Essling Land
 
 
 28
 Hawkinson testified, at length, about the suitability of the Essling land for development of 24 condominium units. However, on cross-examination Hawkinson admitted that he did not know of any condominiums in northern Minnesota that did not have road access. He also stated that there were no condominiums in Voyageurs National Park. Hawkinson identified, by name, two areas in northern Minnesota which have been developed with condominiums having road access. However, on cross-examination Hawkinson admitted that these condominiums were located around skiing areas. Hawkinson testified that the Essling land was an ideal location for a condominium and stated that he felt "it would go over wonderful because it's the first of its kind."
 
 
 29
 Based on the lack of credible evidence of a demand for the proposed use in the reasonably near future, the district court erred in admitting evidence that the highest and best use of the property was as a condominium site. As stated by this court in Mills v. United States, 363 F.2d 78, 81 (8th Cir. 1966):
 
 
 30
 Value implies demand and a buyer. (The witness') testimony assumed both but, apart from his own comment that he 'would be interested in buying tracts of land such as' those of the owners, afforded proof of neither. * * * (T)here must be more than a mere theoretical future demand and use. 'There must be some objective support for the future demand, including volume and duration. Mere physical adaptability to a use does not establish a market.'
 
 
 31
 (Citations omitted.)
 
 IV. Comparable Sales
 
 32
 The landowners argue that their appraisers' opinions of the fair market value of the properties were based on comparable sales and the subdivision and condominium plans were merely an alternative feasible use. The record, however, refutes the landowners' argument.
 
 
 33
 Hawkinson's valuation of the properties clearly was based on its highest and best use as subdivision or condominium. Hawkinson testified that his subdivision and condominium plans "verified" his opinion of fair market value. In reference to "Plan 2" for subdivision of the Bassett land, Hawkinson valued 21 "back lots" at $3,000 each although no comparable sales of such lots were placed in evidence.
 
 
 34
 More importantly, the bulk of the landowners' "comparable sales" evidence involved sales of small platted lots or islands. We have found a lack of credible evidence that "off lake" property is needed for subdivisions, therefore, the landowners' evidence of "comparable sales" would not sufficiently support their experts' opinions.
 
 V. Finality
 
 35
 The landowners argue that the judgments in this case do not constitute a "final decision" appealable under 28 U.S.C. § 1291. The landowners believe that because the government is not compelled to pay the judgments or some portion thereof to the landowners and thus "take" the property, the judgments are not final decisions.
 
 
 36
 "A 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945). We have not found any authority for the position of the landowners that the failure of the government in a condemnation action to "take" the land prior to appeal robs the judgment of finality. As the Supreme Court has stated:
 
 
 37
 The determination of the award is an offer subject to acceptance by the condemnor and thus gives to the user of the sovereign power of eminent domain an opportunity to determine whether the valuations leave the cost of completion within his resources. Condemnation is a means by which the sovereign may find out what any piece of property will cost.
 
 
 38
 Danforth v. United States, 308 U.S. 271, 284, 60 S.Ct. 231, 236, 84 L.Ed. 240 (1939) (footnote omitted). The government may not, however, defer the deposit of funds in court in order to compel an agreement on the price of the property. See 42 U.S.C. § 4651(7).
 
 
 39
 We, therefore, hold that the judgments were final decisions appealable under 28 U.S.C. § 1291.Conclusion
 
 
 40
 The jury's valuation of just compensation in these cases was closer to the landowners' appraisers valuation than that of the government appraiser. The valuation of the landowners' appraisers, we have found, was directly linked to the inadmissible evidence of the highest and best use. Also, the evidence of cost of development of each tract was in reference to development of the complete parcel into either a subdivision or condominium units. Thus, we cannot say that the admission of such evidence was harmless.
 
 
 41
 Our decision does not bar on retrial opinion testimony as to subdividing lake frontage into parcels or lots appropriate to and measured by demand for lake frontage parcels in comparable remote areas of Northern Minnesota lakes.
 
 
 42
 These cases are remanded for a new trial and the admissibility of highest and best use evidence is to be determined in accordance with this opinion. Each party shall bear their own costs on appeal.
 
 
 
 [1]
 The Honorable Miles W. Lord, United States District Judge for the District of Minnesota
 
 
 [2]
 Hawkinson also testified that the Essling land could be subdivided into lots. However, almost all of Hawkinson's testimony regarding the Essling land centered on the condominium plans