696 F.2d 559
 12 Fed. R. Evid. Serv. 428
 UNITED STATES of America, Appellant,
v.
158.24 ACRES OF LAND, MORE OR LESS, SITUATE IN ASHLEY,
BRADLEY AND UNION COUNTIES, STATE OF ARKANSAS, and
Dale D. Cheatham, et al., and Unknown
Owners, Appellees.
 Tract No. 212.
 No. 81-1616.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 11, 1982.
Decided Dec. 27, 1982.
 
 Carol E. Dinkins, Asst. Atty. Gen., Washington, D.C., Larry R. McCord, U.S. Atty., J. Michael Fitzhugh, Asst. U.S. Atty., Fort Smith, Ark., Jacques B. Gelin, Albert M. Ferlo, Jr., Attys., Dept. of Justice, Washington, D.C., for appellant.
 Worth Camp, Jr., Mary Thomason, El Dorado, Ark., for Dale D. Cheatham.
 Before HENLEY* and McMILLIAN, Circuit Judges, and HUNGATE,** District Judge.
 HENLEY, Senior Circuit Judge.
 
 
 1
 In this eminent domain proceeding the United States has appealed a judgment of $43,200.00 entered upon a jury verdict as just compensation for the taking of 6.9 acres of land December 1, 1976, formerly belonging to appellee Dale D. Cheatham and identified here as Tract 212. The government questions admissibility of opinion evidence of the landowner's witness Crawford as being speculative and contrived from an improper method of valuation. At trial the government unsuccessfully moved to strike all the testimony of Crawford; post-trial it filed unsuccessfully its motion for judgment n.o.v. or, alternatively, for remittitur or for a new trial.
 
 
 2
 Finding error in the admission of the ultimate opinion as to value given by the witness Crawford, we order remittitur, or, in the alternative, if remittitur be not entered we reverse and remand for a new trial.
 
 
 3
 Tract 212 lies in the Town of Felsenthal, Union County, Arkansas. Along with other property, it was taken by the United States for use in connection with development of a substantial water project known as the Felsenthal Fish and Wildlife Refuge. The Felsenthal project covers some 65,000 acres principally, if not entirely, in Ashley, Bradley and Union Counties, Arkansas, and in turn is part of a comprehensive plan for the Red River Basin, including the Ouachita and Black Rivers in Arkansas and Louisiana.
 
 
 4
 The Town of Felsenthal was surveyed and platted in 1904 at the instance of Mr. Ike Felsenthal, who at the time owned much, perhaps all, of the land covered by the plat.
 
 
 5
 Encouraged no doubt by prospects for development of mineral and timber resources of the area and by the advantages of urban centers along railway lines, Mr. Felsenthal planned most ambitiously. Some 176 city blocks were platted into small lots along both sides of the right-of-way of the St. Louis, Iron Mountain and Southern Railroad (later the Missouri Pacific) as well as within the cup of the "y" created by the junction of the Little Rock and Monroe Railroad right-of-way and the Iron Mountain.
 
 
 6
 Although there was no courthouse at Felsenthal, and never has been, provision was made for a court square. Several blocks were provided for business locations and along the north side of the Iron Mountain right-of-way acreage was provided for operation of a lumber company, a brick plant, a stave factory and for other industrial and commercial uses. Generous provision for a fairground, including racetrack, was made.
 
 
 7
 Alas, Felsenthal fell short of its promise. Few of its platted streets were opened. Its commercial activity became moribund or ceased. Even its fish processing plant failed. By 1973 its remaining rail line, the Missouri Pacific, was abandoned, the rails removed and the ballast hauled away for use on county roads.
 
 
 8
 By 1973, indeed today, the principal appeal of Felsenthal was and is its proximity to the Ouachita River and the body of swamp, timber and water called "Grand Marais" which in this record is described with apparent modesty as the greatest fishing hole in the world.
 
 
 9
 According to Mr. Cheatham, some thirty years before trial there were about twenty-five families in Felsenthal. By December, 1976 the town was about the same with a few more houses and some people who moved in for weekends or summers and then went home. Mr. Bledsoe, testifying for the government, estimated the December, 1976 population at four hundred to five hundred. Although their estimates of population were by no means either precise or in agreement, the testimony of both Cheatham and Bledsoe warrants the conclusion that by time of trial Felsenthal had grown substantially and that population, including part time weekend or summer residents, perhaps was nearing one thousand.[1]
 
 
 10
 Tract 212 lies immediately north of the abandoned Missouri Pacific right-of-way and within the portion of the town originally platted for industrial use. At date of taking it was unimproved and had not been subdivided into small lots. It contained a pond of .26 acres and two wells.
 
 
 11
 Subject property is on some of the highest ground in Felsenthal. The entire area is subject to occasional flooding. However, at least a portion of the Cheatham land lies seventy-five feet above mean sea level and that portion seldom, if ever, floods.
 
 
 12
 Primary access to the property is by way of Second Street which crosses the abandoned railroad bed and connects with K Avenue, some one-half block to the south.[2] K Avenue, which is the primary arterial street through Felsenthal, is a hard surfaced county road leading to the Grand Marais waterfront and to the Felsenthal dam site. In another direction K Avenue leads to a fork. At the fork a turn to the north will lead to Highway 82. The other prong of the fork leads to Huttig, thence to El Dorado.
 
 
 13
 At trial, the landowner introduced testimony that the highest and best use of the land was as an unimproved subdivision to be used by residential and weekend fishermen. This use contemplates the division of the property into small lots which could apparently range in size from 25' X 125' to 50' X 150'. The landowner also introduced testimony through his expert witness Crawford that lots of comparable size in the area were selling for a price per square foot of from $.16 to $.24 as of the date of taking. On the basis of these sales, Mr. Crawford estimated that the "small lot" value of the subject land was $.20 per square foot, and stated that the total value of the subject property was therefore $60,112.80.
 
 
 14
 At the conclusion of direct examination of Mr. Crawford, the government moved to strike his testimony on grounds that the witness had valued the land on a lot or square foot method and had not relied on sales that were comparable in size to the subject tract. The trial court denied the motion, stating that Mr. Crawford has testified as to "what he conceived would be the highest and best use of the property involved in this matter and then he has explained his research and what he has found out with reference to comparable sales." Consequently, the motion to strike was denied.
 
 
 15
 The government contends that the trial court committed error in allowing the jury to consider speculative valuation testimony based on the lot method of valuation. We agree that in part the testimony of Crawford was inadmissible.
 
 
 16
 By now it is elemental that just compensation in a condemnation case and the concept of fair market value include value attributable to any use to which the property is adapted and might be put, and that compensation may be awarded upon the basis of the most advantageous and valuable use. But to warrant admission of testimony as to value for purposes other than that for which the property actually is used however, regard must be had for existing conditions and wants of the community or such as may reasonably be expected in the immediate future. The uses considered must be so reasonably probable as to have an effect upon the present market value of the land, and a speculative value cannot be considered. Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236 (1934); United States v. Foster, 131 F.2d 3 (8th Cir.1942), cert. denied, 318 U.S. 767, 63 S.Ct. 760, 87 L.Ed. 1138 (1943); United States v. 620 Acres of Land, 101 F.Supp. 686 (W.D.Ark.1952).
 
 
 17
 In United States v. 341.45 Acres of Land [Bassett], 633 F.2d 108 (8th Cir.1980), cert. denied sub nom. Bassett v. United States, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981), this court held that "a proposed 'use' requires a showing of reasonable probability that the land is both physically adaptable for such use and that there is a demand for such use in the reasonably near future." Id. at 111 (emphasis original); see United States v. 77,819.10 Acres of Land, 647 F.2d 104, 110 (10th Cir.1981), cert. denied sub nom. New Mexico v. United States, --- U.S. ----, 102 S.Ct. 1971, 72 L.Ed.2d 441 (1982).
 
 
 18
 First, the trial judge should screen the evidence for potential uses. Then, the trial judge should decide whether "the landowner has produced credible evidence that a potential use is reasonably practicable and reasonably probable within the near future * * *." If credible evidence of the potential use is produced, the jury then decides "whether the property's suitability for this use enhances its market value, and, if so, by how much."
 
 
 19
 Bassett, 633 F.2d at 111 (citations omitted), quoting United States v. 320.0 Acres, County of Monroe, Fla. [Monroe], 605 F.2d 762, 817 (5th Cir.1979).
 
 
 20
 In the instant case, the landowner's appraiser relied on four small lot sales as being sales of property comparable to the proposed lots on the subject property. These lots, like the subject property, were without streets, lights, utilities, or improvements. Furthermore, although these lots (unlike the subject property) had been platted, there was testimony to the effect that the services of a surveyor would be required if the precise boundaries of the platted property were to be determined.
 
 
 21
 We observe, however, that the small lot sales relied on by Mr. Crawford were nevertheless isolated sales of single lots. Thus, although his testimony was useful to show what small lots brought when sold, it does not necessarily follow that there is any nonspeculative evidence of a demand in the near future for a substantial number of lots such as those proposed by the witness pursuant to his plan of subdivision and small lot development.
 
 
 22
 To credibly establish demand for such lots, we believe that more than a few sporadic sales of such lots are necessary. Rather, there must be some evidence that others have developed and sold such lots, so as to establish a trend, at least, toward that type of development of ... property.
 
 
 23
 Bassett, 633 F.2d at 112.
 
 
 24
 The landowner contends that the testimony of a neighboring landowner, Mr. Short, is credible evidence which establishes such a trend. Mr. Short testified that he owns a 11.5 acre tract of land approximately two-thirds of a mile from the subject property. This land, like the subject property, has not been surveyed and platted into small lots, but Mr. Short had nevertheless proceeded to sell small parcels of the tract to individuals. In particular, Mr. Short testified that every lot put up for sale had sold.
 
 
 25
 Although this testimony is helpful, it is not sufficient to establish a "trend of subdivision" such as to justify completely the testimony of Crawford. We have diligently searched the record, and we can find no evidence indicating the exact number of small lots from this tract that Mr. Short had, in fact, sold. Although it can fairly be inferred from the record that Mr. Short sold at least six such lots from 1974 to the date of taking of the subject property, we observe that his tract is of sufficient size that perhaps as many as one hundred 50' X 100' lots could be contained therein. In these circumstances, we are not prepared to hold that Mr. Short's testimony is sufficient to establish evidence of a trend of more than occasional demand for such subdivided lots.
 
 
 26
 We are mindful that the government testimony is that the highest and best use of the property is for recreational or other housing and we are aware that the record reflects that in 1976 Felsenthal to some extent was growing in popularity, but, as indicated, the evidence simply is insufficient to show any such demand for lots as would justify, without more, a valuation based entirely upon "lot method" or square footage computation.
 
 
 27
 It is to be remembered that the property being taken is an undivided tract of 6.9 acres of unimproved land that may be suitable for subdivision and the question is what is the fair market value of such a tract. Account must be taken of all factors which would be considered by a prospective purchaser, including, inter alia:
 
 
 28
 (1) Cost of subdivision including loss of land for streets and utility easements, platting and surveying expense, road and street improvements;
 
 
 29
 (2) Cost of holding the property while it is being subdivided and sold, briskness of demand, etc.
 
 
 30
 The record contains little by way of evidence on any of these factors. It is true that with respect to some of them little may be required. United States v. 1,291.83 Acres of Land, 411 F.2d 1081 (6th Cir.1969). But as held in United States v. Iriarte, 166 F.2d 800 (1st Cir.), cert. denied, 335 U.S. 816, 69 S.Ct. 36, 93 L.Ed. 371 (1948), while nearby lot sales may be used to indicate the value of undeveloped acreage, it is patent error to value the land by "simply multiplying the number of square meters in it by the average price per square meter at which" the neighboring lots were sold.
 
 
 31
 That method of valuation leaves out of account the cost of subdivision and sale of lots, and also the allowance which would have to be made for the reduction in area available for sale by lots resulting from the necessity for laying out streets, etc. The question in cases of this sort is the value of the land before subdivision, not afterward ....
 
 Id. at 804.[3]
 
 32
 From what has been said to this point, it is clear that the ultimate opinion as to fair market value stated by the witness Crawford and his underlying multiplication of square footage by an assumed average of $.20 per square foot should not have been admitted. It is equally clear, however, that the remainder of his testimony as to lot sales, highest and best usage, and the like, was admissible at least with cautionary instructions and with its weight to be assessed by the jury. In such circumstances, it is to be regretted that more pointed objection to the offending portions of the testimony did not call to the attention of the trial court more precisely the inadmissible portions of the testimony.
 
 
 33
 In any condemnation case it is quite likely that some questionable evidence will get into the record and that some items of evidence are admissible for limited purposes only. The problem usually can be taken care of through timely objection or by cautionary instructions requested and given at the time at which evidence comes in. However, a case of this kind involves more than a clash of private interests in which the course of the litigation may be charted by opposing counsel. A landowner is entitled to just compensation but he is not entitled to be enriched at the expense of the public purse. Thus, a trial court has an independent obligation, to a reasonable extent, to see that the landowner's claim is submitted only on competent evidence. United States v. 91.90 Acres of Land, 586 F.2d 79 (8th Cir.1978), cert. denied, 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979).
 
 
 34
 We turn then to consideration of the prejudice, if any, resulting from the offending testimony, for we recognize that admission of evidence to some extent is discretionary, United States v. 428.02 Acres of Land, 687 F.2d 266 (8th Cir.1982), and we are mindful of the harmless error rule as applied to jury cases. Fed.R.Civ.P. 61. Moreover, we commonly sustain awards that are "within the scope of the evidence." United States v. 9.20 Acres of Land, 638 F.2d 1123, 1126 (8th Cir.1981).
 
 
 35
 Apart from the inadmissible conclusion of witness Crawford, the only other statements of opinion as to value came from the landowner, who testified that he had asked $56,000.00 for the land and thought it was worth more, and from the government witness Bledsoe who put fair market value at about $800.00 per acre, rounded to $5,500.00 for the tract. An offer to sell may not be considered as evidence of fair market value, and Bledsoe's opinion falls far short of the jury verdict of $43,200.00.
 
 
 36
 If it be assumed that in accordance with the court's instructions,[4] the jury found that susceptibility of subdivision enhanced value to the extent that $43,200.00 represented fair market value of the tract as a whole, such a valuation is not supported by competent probative evidence and the verdict cannot stand.
 
 
 37
 The most comparable sale shown in evidence is that of the 11.5 acres now owned by the witness Short. It is similar land similarly situated in Felsenthal that sold for about $630.00 an acre in 1974. Bledsoe used this sale, adjusted to December, 1976, as a basis for his opinion as to value of about $800.00 per acre.[5]
 
 
 38
 Sales of other allegedly comparable acreages some distance from Felsenthal ranged in the order of $400.00 to $522.00 per acre. As has been shown, sales of lots in Felsenthal, though not in great number, did occur from time to time and at prices in the order of $750.00 per lot.
 
 
 39
 We are told that in 1976 Felsenthal was enjoying some increase in activity. Some new people were acquiring sites for camp facilities or residences. Some efforts were being made to reorganize city government and to provide better utility service. The jury would have been warranted in concluding that Tract 212 was one of the most valuable acreages in the area and that there was a market for lot sales of increasing frequency. The jury could well have concluded on the record as a whole that because of location, access and other advantages Tract 212 was worth much more than the more remote sale tracts said to be comparable and substantially more per acre than the Short tract of 11.5 acres. Moreover, in light of the other evidence, the jury could have concluded that Bledsoe's compounding factor of 10% was on the low side.
 
 
 40
 As juries are so often instructed, and indeed as doubtless they were instructed in this case, within limits the jury may weigh the evidence and draw from the facts reasonable inferences and conclusions, using in this connection the jurors' own reason, common sense and experience in life; and after considering the factors we have mentioned, along with other admissible evidence, had the jury here found a fair market value in the order of $1,000.00 to somewhat less than $2,000.00 an acre for subject tract, this court might well have sustained it. But such was not the result.
 
 
 41
 This case has been pending a long time. Tract 212 was condemned more than six years ago. Its time consuming course, including the prolonged period of appellate judicial gestation, for which the parties are by no means wholly responsible, in justice should be brought to a close. Rather than order a new trial outright, we believe that the option of a remittitur is appropriate because it provides the possibility of a resolution which could conserve judicial resources, reduce costs, and enable the landowner to be paid. Compare United States v. 47.14 Acres, 674 F.2d 722 (8th Cir.1982).
 
 
 42
 It is not necessary that the remittitur be susceptible of precise calculation, id. at 728, and indeed such would be impossible here. But, as stated, we think the jury properly could have found a fair market value of somewhat less than $2,000.00 per acre. Accordingly, we fix remittitur on the basis of $13,000.00 as just compensation for Tract 212.
 
 
 43
 Although our figure is low as compared to the jury verdict, it may be too high. If so, the government must accept a share of the responsibility for the state of the record. Id. at 728. If the amount is too small, the landowner may reject it and elect a new trial.
 
 
 44
 In accordance with the foregoing, we direct that if within twenty days from and after issuance of mandate herein appellee consents to a remittitur of $30,200.00 the judgment as remitted will stand affirmed as of the date of judgment from which appeal was taken with interest and costs in the district court as provided by law. In the absence of such remittitur, the district court will vacate its judgment and award a new trial. In this court each party will bear his or its own costs.
 
 
 45
 For further proceedings consistent with this opinion, the case is remanded.
 
 
 
 *
 Judge Henley assumed senior status June 1, 1982
 
 
 **
 The Honorable William L. Hungate, United States District Judge, Eastern District of Missouri, sitting by designation
 
 
 [1]
 While these population estimates do not appear to be particularly reliable, we accept them for present purposes
 
 
 [2]
 At least at some times there is access by boat also
 
 
 [3]
 Where market data developed from nearby lot sales was adjusted by showing of selling expense, engineering costs, overhead, taxes, etc., opinion evidence based on such computations was admissible. United States v. 100 Acres of Land, 468 F.2d 1261 (9th Cir.1972), cert. denied, 414 U.S. 822, 864, 94 S.Ct. 37, 119, 38 L.Ed.2d 54, 84 (1973)
 
 
 [4]
 No objection was made to instructions given by the court and it is not contended here that they were in error
 
 
 [5]
 Bledsoe's computation was $807.00 per acre based on adjustment of $630.00 an acre paid for 11.9 acres in 1974. Actually, there may have been only 11.5 acres which would result in a purchase price of about $652.00 an acre, and consequently a higher adjusted price. The witness used an adjustment figure of 10% compounded annually