**LOVELADIES HARBOR, INC., and Loveladies Harbor, Unit D, Inc.,**
Plaintiffs,

v.

**The UNITED STATES, Defendant.**

**No. 243–83L.**

United States Claims Court.

July 23, 1990.

Kevin J. Coakley, with whom was Stephen D. Kinnard, Roseland, N.J., for plaintiffs.

Gary S. Guzy, with whom was Fred R. Disheroon, Washington, D.C., for defendant.

## OPINION

SMITH, Chief Judge.

This regulatory taking claim is before the court after a one-week trial, which followed the denial of cross-motions for summary judgment. After considering evidence presented at trial and having examined the site with the aid of counsel and expert witnesses, the court finds that the Army Corps of Engineers' denial of a permit to fill plaintiff's property resulted in a taking, and accordingly awards just compensation as mandated by the fifth amendment.

## FACTS

The majority of the facts underlying this case previously were set forth in *Loveladies Harbor, Inc. v. United States*, 15 Cl.Ct. 381 (1988), and are recited briefly below for the reader's convenience.

Plaintiffs purchased approximately 250 acres of vacant land in Long Beach Township, Ocean County, New Jersey for $300,-000 in 1956. By May 5, 1982, 199 acres had been improved by landfill, where necessary, and by the construction of homes. Most of these acres had been sold to the general public. Development of the remaining 51 acres was prevented by the enactment of certain state and federal statutes regulating wetlands. These statutes required permits before the filling of any wetlands.[1] Most of the land at issue here could not be used without such fill permits.

---

**1.** Pursuant to the New Jersey Wetlands Act of 1970 (codified at N.J.S.A. 13:9A–1 *et seq.*) the

Plaintiffs twice applied for a state fill permit, first requesting a permit to fill 51 acres, and later, subsequent to a settlement offer by the state agency, a permit to fill 12.5 acres. The result of the state permitting process, including one appeal to the Appellate Division of the New Jersey Superior Court, was that plaintiffs were granted a permit to fill 11.5 acres subject to the condition that plaintiffs mitigate the destruction of the wetlands by creating a corresponding amount of new wetlands. The NJDEP denied plaintiffs request to fill an additional acre because it already had been filled.

At the same time they sought a state permit, plaintiffs applied to the Corps for a federal permit. After two denials by the Corps, and following the state's grant of a permit for the fill of 11.5 acres, plaintiffs sought a federal permit for 11.5 acres, which would have enabled them to develop the 12.5 acres at issue. This permit application was denied by the Corps on May 5, 1982, a decision that subsequently was affirmed by the district court. *See Lovela-*

*dies Harbor, Inc. v. Baldwin,* Civil No. 82–1948 (D.N.J. Mar. 12, 1984) (unpublished), *aff'd without opinion,* 751 F.2d 376 (3d Cir.1984). Plaintiffs then filed suit in this court, seeking just compensation for the alleged taking of 11.5 acres of wetlands and one acre of uplands.

On August 12, 1988, this court denied cross-motions for summary judgment on liability, stating that there remained a genuine issue of material fact as to whether the property retained any economically viable use after the Corps' permit denial. 15 Cl.Ct. at 398.[2] The court rejected defendant's argument that the entire 250 acres should be considered for determining the extent to which the permit denial affected plaintiffs' interests, holding that the only parcel at issue was the 12.5 acres. *Id.* at 391–93. The court also indicated that plaintiffs' proposed use of the property, although validly prohibited by the Corps, did not constitute an activity that would bring it within the nuisance exception to the requirement of just compensation. *Id.* at 388–90.[3]

New Jersey Department of Environmental Protection (NJDEP) administers the state's fill permit program for regulated wetlands. Under the Clean Water Act (codified as amended at 33 U.S.C. §§ 1251–1376 (1988)), the United States Army Corps of Engineers (Corps) performs a similar function, granting or denying permits to discharge fill or dredged material into regulated wetlands.

2. In the course of its cross-motion for summary judgment, defendant argued that one possible alternative use for the property was for the construction of several deck houses. This raised the factual issue of whether there remains any economically viable use for the property, necessitating the denial of the cross-motions. Plaintiffs now argue that because the court would have entered summary judgment in their favor in the absence of the deck house plan, a determination that the deck house plan would not have been viable, or the fact that defendant may have abandoned that concept, should end the court's present inquiry in plaintiffs' favor. The court does not accept that position. Although defendant's deck house plan may have indicated the existence of a genuine issue of material fact, the court was very clear in its statement that the issue for trial was whether there remained *any* economically viable use for the property.

3. Although the discussion in the prior opinion addressed this issue under the heading "substan-

tial advancement test," it is clear from the substance of the discussion and from the parties' briefs throughout this litigation that the critical question was whether plaintiffs' had a protectable property interest, to which the court answered in the affirmative. Defendant continues to argue, however, that the activity proposed by plaintiffs would have constituted a nuisance, and therefore plaintiffs's claim would fall within a recognized exception to the fifth amendment. *See, e.g., Mugler v. Kansas,* 123 U.S. 623, 668–69, 8 S.Ct. 273, 300–01, 31 L.Ed. 205 (1887); *Allied–General Nuclear Servs. v. United States,* 839 F.2d 1572, 1576 (Fed.Cir.1988). Defendant's argument primarily is premised on the Corps' denial of the permit request. The court would note that in issuing its Water Quality Certificate, the NJDEP stated that the proposed development would have been "conducted in a manner which will not violate applicable water quality standards of the State of New Jersey." Because it is the state's function, and not that of the Corps, to regulate land use, it is reasonable to defer to the state's findings concerning pollution, and to read the Corps' findings as a permissible exercise of their jurisdiction over federally-regulated wetlands. The court addressed this issue more fully in its summary judgment opinion, and notwithstanding defendant's continuing efforts, the court does not find any merit in the government's argument that the court's earlier decision was incorrect.

## DISCUSSION

In *Agins v. Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980), the Supreme Court indicated that a regulation, in that case a zoning law, as applied to a particular property may effect a taking if it does not substantially advance legitimate state interests (citing *Nectow v. Cambridge*, 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928)), or if it "denies an owner economically viable use of his land" (citing *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 138 n. 36, 98 S.Ct. 2646, 2666 n. 36, 57 L.Ed.2d 631 (1978)). *See also United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). It has become axiomatic that whether the application of a regulation results in a taking is highly fact-specific, and is not subject to analysis by a set formula. *Penn Central*, 438 U.S. at 128, 98 S.Ct. at 2661. It is "a question of degree—and therefore cannot be disposed of by general propositions." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 416, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922).

In this case, the court already has stated that the determination that a regulation is intended to advance a legitimate state interest does not preclude a taking; rather, it is but one factor in determining who should bear the burden of paying for the regulatory action. 15 Cl.Ct. at 388. Here, plaintiffs' claim is that the Corps' denial of plaintiffs' permit application denied them all economically viable use of their land, and thus imposes upon these plaintiffs a confiscatory burden.

There is no tidy formula for determining when a regulation or its application denies an owner economically viable use of its land and thereby results in a taking. Rather, the Supreme Court has characterized the analytic process as one relying

> instead on ad hoc, factual inquiries into the circumstances of each particular case.... To aid in this determination, however, we have identified three factors which have "particular significance." (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the government action."

*Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224-25, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986) (citations omitted). *See also Keystone Bituminous Coal Ass'n v. De Benedictus*, 480 U.S. 470, 494-95, 107 S.Ct. 1232, 1247, 94 L.Ed.2d 472 (1987) and cases cited therein.

■ As a part of this analysis, the court must compare the value of the property before the government action with the value after the government action. *See, e.g., Keystone Bituminous*, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472; *Goldblatt v. Hempstead*, 369 U.S. 590, 594-95, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962); *Formanek v. United States*, 18 Cl.Ct. 785, 798 (1989). In a case factually similar to the one at bar, and on which this court relied in deciding the cross-motions for summary judgment, the Court of Appeals for the Federal Circuit noted, "[i]f there is found to exist a solid and adequate fair market value ... which [plaintiffs] could have obtained from others for that property, that would be a sufficient remaining use of the property to forestall a determination that a taking had occurred...." *Florida Rock Indus. v. United States*, 791 F.2d 893, 903 (Fed.Cir.

---

In the same vein, defendant argues that because some of plaintiffs' property is below the mean high water mark and therefore is subject to a dominant navigational servitude, there can be no taking of that portion of the land. In its post-trial brief, defendant wisely relegates this argument to a footnote, citing only a 1970 opinion of the Court of Appeals for the Fifth Circuit. More recently, the Supreme Court noted that "this Court has never held that the navigational servitude creates a blanket exception to the Takings Clause whenever Congress exercises its Commerce Clause authority to promote naviga-

tion." *Kaiser Aetna v. United States*, 444 U.S. 164, 172, 100 S.Ct. 383, 388, 62 L.Ed.2d 332 (1979). Throughout its opinion, the Court emphasized that the nature of the navigational servitude, in the context of the facts of a specific case, must be taken into consideration as part of the broader concern for the relative weights of public and private interests at stake. As applied to this case, the fact that some of plaintiffs' property may be subject to a navigational servitude does nothing to tip the scales in defendant's favor.

1986), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987).

### Value Before Government Action

At the outset, the court must define the terms "fair market value" and "highest and best use." By industry definition, market value is:

The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.

American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 19 (9th ed. 1987). Intrinsically linked to the determination of fair market value is a determination of the highest and best use. This is defined by the industry as, "[t]he reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." *Id.* at 269.[4] Consistent with the foregoing, valuations in eminent domain proceedings "may reflect not only the use to which the property is presently devoted but also that use to which it may be readily converted." *United States v. Powelson,* 319 U.S. 266, 275, 63 S.Ct. 1047, 1052, 87 L.Ed. 1390 (1943).

Plaintiffs maintain that the highest and best use for their property would have been as a prepared site for a 40–lot residential development. This is based on an appraisal performed by plaintiffs' expert, James P. Montague, and includes the costs of preparing the site for further development. These costs are based on a develop-

ment plan prepared by John L. Yoder, P.E., of the consulting engineering firm Horn, Tyson & Yoder, Inc. Both Mr. Montague and Mr. Yoder testified at trial. In addition, the court heard the testimony of Michael D. Miller, an environmental consultant, who testified to the cost and likelihood of complying with the NJDEP's mitigation condition, a cost which was not included in Mr. Montague's appraisal.

As a result of a comparable sales analysis, Mr. Montague determined that the gross value of the vacant land as of May 5, 1982 was $3,720,000, taking into account variations for lot sizes, shapes, views, and proximity to water. The cost of preparing the property was estimated by Mr. Yoder to be $900,500 as of May 5, 1982. Mr. Miller testified that complying with the states' mitigation condition was feasible, and would have cost approximately $161,500, including the acquisition of the mitigation site; this was supported by the testimony of defendant's witness, John Weingart, the Director of the Division of Coastal Resources of the New Jersey Department of Environmental Protection.

Although defendant does not offer an alternative highest and best use, nor does it present its own appraisal of the property's fair market value before the permit denial, it seeks to discredit plaintiffs' argument, primarily by asserting that plaintiffs had not met the conditions imposed by the NJDEP, among which were mitigation and *the very permit approval by the Army Corps of Engineers that is at issue in this case.*[5] Defendant claims that plaintiffs' appraisal is inadequate because it does not account for a possibility that all permits would not be obtained, a factor by which a knowledgeable buyer would discount his purchase price. Moreover, because the necessary state permits were not in place,

---

**4.** These definitions were incorporated, with some very minor word changes, in the appraisals submitted in this case.

**5.** Defendant also argues that plaintiffs' appraisal must be disregarded because the highest and best use proffered depends on an "impermissible activity," namely, placing fill in wetlands.

This argument is reminiscent of defendant/appellant's argument in *Florida Rock,* to which the Federal Circuit responded, "We suppose appellant added this contention to provide a little humor for an otherwise serious and scholarly brief, and say no more about it." 791 F.2d at 905. Neither shall this court.

the Corps' action could not have effected a taking.[6]

Plaintiffs' extensive evidence indicated that they would have been able to meet all of the state conditions had the Corps approved their permit request. Although plaintiffs had not located an acceptable mitigation site, there is ample evidence that compliance with this state-imposed condition was well within reason. Plaintiffs also presented thorough and detailed estimates of the cost of complying with the state conditions, as well as the cost of engineering and improvement to the property, including preparing the site for residential development. Although it may be true that the plaintiffs' appraisal did not consider the possibility that all necessary permits would not be obtained, the evidence at trial indicated that the likelihood of that happening was negligible, and would have had no impact on the fair market value. Defendant may be correct that there are some deficiencies in the cost estimates used in plaintiffs' appraisal, and defendant may be correct that the appraisal incorrectly assumed construction would have begun on the date of the alleged taking. The court, however, is convinced that plaintiffs' appraisal is a fair and accurate estimate of the property's fair market value as of May 5, 1982.

Plaintiffs have proven that the highest and best use for their property before the government action was as a 40–lot residential development. This proposed use would have been physically possible and financially feasible; furthermore, it was a use to which the property could have been readily converted. Based on the documentary evidence and testimony presented, the court therefore is persuaded that the fair market value of plaintiffs' property before the government action was $2,658,000.

### Value After Government Action

Defendant maintains that there has not been a taking of plaintiffs' property because plaintiffs have failed to demonstrate that there are no remaining economically viable uses. More specifically, defendant argues that plaintiffs' failure to apply for a permit to fill less than 12.5 acres defeats plaintiffs' claim as a matter of law. Plaintiffs point out that their request for a permit to fill 12.5 acres follows the denial of a previous application covering 51 acres and an application that would have enabled plaintiffs to develop 37.6 acres. Plaintiffs further maintain that their evidence establishes that further applications would have been virtually futile, giving rise to the equivalence of a presumption that there are no economically viable uses, and that the burden is on defendant to prove otherwise. In light of the evidence presented by both sides, the court is strongly convinced that the property is without any economically viable use in the absence of a fill permit.

As a preliminary matter, it is incumbent upon the court to reiterate some ground rules concerning the parties' respective burdens of proof. There is no dispute that plaintiffs bear the burden of proving the elements of their cause of action, including the absence of any remaining economically viable use. Common sense, however, indicates the impossibility of requiring the plaintiffs to prove a negative. The Federal Rules of Evidence and the wisdom of leading scholars buttress this conclusion.

Rule 301 of the Federal Rules of Evidence reads in its entirety:

> In all civil actions and proceedings not otherwise provided for by Act of Con-

---

**6.** Defendant also points to the property's 1982 tax assessment as evidence that the 12.5 acres had a value of $377,412. The court would note that valuation for determining the scope of protection afforded by the fifth amendment is different from valuation for state taxation purposes. Each state expresses unique concerns by the way in which it chooses to value property for taxation; the inviolable mandate of the fifth amendment, however, does not permit such variety. Although defendant's expert witness testified that tax assessments are indicative of fair market value, he also testified that the assessments are only as good as the individual appraisers, not all of whom visit the property or reexamine the relevant data on a yearly basis. Thus, even if the court believed that a tax assessment might be probative of fair market value in an eminent domain proceeding, because the court is unable to assess the efficacy of the appraisal of the property at issue, it is without any persuasiveness in this case.

gress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

While directed at presumptions, this rule and the commentary on it make it clear that the risk of non-persuasion, or the burden of persuasion, never shifts. This is not true of the burden of production, *i.e.*, the responsibility for presenting sufficient evidence that

> if [that party] stops and his adversary does nothing, his victory (so far as it depends on having the inferences he desires drawn) is at once proclaimed.... Whenever the first producer has presented evidence sufficient to get him to [that] stage and the burden of producing evidence can truly be said to have shifted, his adversary may in turn pass through the same [process].

C. McCormick, *McCormick on Evidence* § 338 (3d ed. 1984).

In this case, plaintiffs correctly have characterized their ultimate burden as one of "persuading the court ... that it is more likely true than not that there remains no economically viable use for [their] property." In doing so, if plaintiffs produce sufficient evidence to establish a *prima facie* case, *i.e.*, to go to the jury if this were a jury case, defendant may present no evidence and still prevail. If plaintiffs present sufficient evidence to be entitled to a directed verdict, the burden of production will have shifted to defendant. The testimony summarized below illustrates why the court finds it not only "more likely than not" but beyond any reasonable doubt that there is no remaining economically viable use for plaintiffs' property.

Plaintiffs' expert, William T. Ard, testified that in the absence of a § 404 permit, the highest and best use of the 12.5 acres is for environmental conservation or recreational purposes, with an attendant fair market value of $1,000 per acre as of May 5,

1982, based on a market data approach. Defendant's expert, Allan G. Black, concurred with the valuation on the wetland portion, but estimated that the one upland acre might be worth somewhat more if a potential buyer perceived it could be developed. Mr. Black also admitted on cross-examination that included in that $1,000 per acre value was the property's potential value for hunting, bird watching, and growing and harvesting salt hay.

Notwithstanding its own expert's testimony, defendant argues that among the potential uses plaintiffs' appraiser overlooks are bird watching, hunting, and harvesting salt hay. Defendant offers little or no proof of any of these uses, relying instead on its perception that plaintiffs bear the entire burden of proof and persuasion. Defendant also claims plaintiffs failed to explore the possibilities of using the property for a marina, for a mitigation site, for aquaculture, and for sale to neighbors who might be interested in preserving their unobstructed water views.

If this were a jury case, the court would be required to "screen the proffered potential uses and exclude from jury consideration those which have not been demonstrated to be practicable and reasonably probable uses." *United States v. 341.45 Acres of Land*, 633 F.2d 108, 111 (8th Cir.1980), *cert. denied sub nom. Bassett v. United States*, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981) (quoting *United States v. 320.0 Acres of Land*, 605 F.2d 762, 815 (5th Cir.1979)). By analogy, the court sitting as a finder of fact must discount proposed uses that do not meet a "showing of reasonable probability that the land is both physically adaptable for such use *and* that there is a demand for such use in the reasonably near future." *Id.* (emphasis in original) (relying on *Olson v. United States*, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236 (1934)).

Although there was persuasive testimony that hunting would not be permitted on the property due to its close proximity to residences, and that farming salt hay would not be economically feasible due to the small size and relative inaccessibility of

the acreage, the parties' disputes over these possibilities seem unnecessary. Defendant's witness agreed that these uses, as well as bird watching, would be included in a highest and best use of conservation and recreation, the use that yielded a value of $1,000 per acre.

The remaining alternative uses suggested by defendant were as a marina, as a mitigation site for other developers, and for sale to neighboring property owners who might wish to ensure an unobstructed water view. Defendant does not represent that these are "reasonably probable" uses, see Olson, but points to plaintiffs' failure to investigate thoroughly their possibility. Plaintiffs' witnesses, Mr. Yoder and Mr. Miller, testified that deed restrictions, zoning requirements, the destruction of wetlands, and the degradation of water quality and of the already suffering shellfish habitat made the construction of a marina unlikely. Defendant's state regulatory expert, Mr. Weingart, admitted on cross-examination that NJDEP would discourage the construction of a marina, and, in some cases, would prohibit it. He also testified that the uplands portion of the property might be used to create new wetlands, and that lagoons that previously had been dug by plaintiffs might be suitable for wetlands enhancement. Assuming that these possibilities rise to the level of reasonable probability, the only evidence that there is a market for this property as a mitigation site are the condition on plaintiffs' own state permit, the testimony of Mr. Weingart that this is a condition frequently imposed by the state on other developers, and the testimony of Frank J. Cianfrani, the Chief of the Regulatory Branch, Operations Division, of the Philadelphia District of the Army Corps of Engineers, that the Corps now often requires mitigation. This does not establish the likelihood of a market for this property in 1982.

Finally, defendant proposes that neighboring property owners might well be interested in acquiring plaintiffs' property to ensure their continued unobstructed water view. This suggestion is premised on the fact that some of the landowners formally opposed the permit applications, hiring attorneys to represent their interests before the state and federal agencies. In light of their successful opposition to plaintiffs' permit requests and the resulting absence of permissible development, it is difficult to imagine why a rational property owner would spend additional money to purchase that which the government already has bestowed.

There is no evidence that the alternative uses proposed by defendant would have met the standard of a reasonable probability for adaptability and demand set forth in Olson, supra. Moreover, even if the court were to accept defendant's unsupported contentions that the property could be adapted for use for hunting, agriculture, as a mitigation site, or a marina, that would not establish a market for that use. See, e.g., Olson, 292 U.S. at 256, 54 S.Ct. at 709; 341.45 Acres of Land, 633 F.2d 108 at 111; United States v. 1,291.83 Acres of Land, 411 F.2d 1081, 1084 (6th Cir.1969); Mills v. United States, 363 F.2d 78, 81 (8th Cir. 1966); United States v. Whitehurst, 337 F.2d 765, 771–72 (4th Cir.1964); Southern Amusement Co. v. United States, 265 F.2d 34, 37 (5th Cir.1959).

For the foregoing reasons, the court finds that the highest and best use for the property after the government action was for recreation and conservation, with a value of $1,000 per acre. Although there was some evidence that the one acre of uplands might be able to be developed and therefore might be able to be sold for up to $40,000, there is no evidence that there is a market for it, and therefore no evidence of a fair market value. The location of the lot makes it improbable that a single home would be built on it; it is more likely than not that this acre will remain an empty lot, and therefore although it was not included in the permit application, the denial of the permit effectively renders this acre without economically viable use, as well as the 11.5 acres of wetlands.[7]

7. Even if the court accepted defendant's argument that the upland lot had a fair market value of $40,000, the resulting diminution in value would be 98%. While this alone is not legally

*Government's Liability*

■ For plaintiffs to prevail, the result of a comparison of the fair market value before the government action and that value after the government action must indicate more than a mere diminution in value, because "[g]overnment could hardly go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal*, 260 U.S. at 413, 43 S.Ct. at 159. When "regulation goes too far," however, the fifth amendment requires just compensation. *Id.* at 415, 43 S.Ct. at 160.

In this case, the value of the property virtually has been eradicated as a result of government action. The value of the property before the taking was $2,658,000; the value of the property after the permit denial was $12,500, resulting in a diminution in value of over 99%. The significance of this impact is heightened when it is recalled that the $1,000 per acre figure represents a reasonable estimate of what a government

entity could be expected to pay for the property, and is not the product of negotiations between a willing buyer and seller under no duress. As a result of government action, there *is* no market; the only potential buyer is a governmental unit, and the only remaining value is a nominal one.

A substantial reduction in value, however, in and of itself is not necessarily a sufficient basis for concluding that a taking has occurred. *See, e.g., Penn Central,* 438 U.S. at 131, 98 S.Ct. at 2662.[8] However, the determination that there has been a taking "ultimately calls as much for the exercise of judgment as for the application of logic." *Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 326, 62 L.Ed.2d 210 (1979). It is this court's judgment that the drastic economic impact on plaintiffs' property, coupled with the court's earlier determination of a lack of a countervailing substantial legitimate state interest, 15 Cl.Ct. at 388–90, forms the basis for a finding that there has been a taking.[9]

---

sufficient to find a taking, it would not change the court's determination under the facts and circumstances of this case. Defendant also argues that because plaintiffs conveyed an easement over some of their property to a neighbor for non-monetary consideration plaintiffs have received sufficient benefit from their property to forestall a taking. This argument is particularly *absurd because the consideration plaintiffs* received was the dedication of a portion of the neighbor's property as a public road, if and when plaintiffs carried out their development plan. If plaintiffs had not obtained this agreement, defendant surely would be arguing that plaintiffs development plan could not have succeeded because a necessary component, *i.e.,* a public road, was not in place. The concept *underlying both of these arguments is that if a* property owner receives any nominal value for its property there can be no taking as a matter of law. Taking jurisprudence does not require such an outcome. Rather, "the determination that governmental action constitutes a taking, is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest." *Agins,* 447 U.S. at 260–61, 100 S.Ct. at 2141. The fact that the "burden" might be mitigated slightly does not alter necessarily the determination, although it certainly would affect the resulting quantum of just compensation.

8. The Court in *Penn Central* indicated that the proper focus must be on remaining uses of the property in light of the regulatory action, rather

than on the diminution in value. *Id.* When the method of valuation necessarily includes the consideration of remaining uses, as does the fair market value approach, this mandate from *Penn Central* is met. Because fair market value is based on the highest and best use for the property, which in turn is based on a legal and economic probability, any diminution in value which is arrived at by comparing fair market values incorporates remaining uses.

9. The court is aware that its analysis does not discuss the character of the government action, nor the frustration of plaintiffs' reasonable investment-backed expectations by that action. These factors are guidelines for aiding the court in *determining when a regulation has gone too* far in impacting on the property's economic viability, and the court is aware of no case that requires that these guidelines be "met" before protection is available under the fifth amendment. The court would note, however, that although the character of the government's action was not in the nature of a physical invasion, its result is nonetheless confiscatory. These factors have not been the subject of dispute between the parties, with the exception that defendant continuously has argued that because the 12.5 acres are part of an original 250 acre tract, and because plaintiffs have made a profit on the entire tract over the years, plaintiffs' investment-backed expectations have not been frustrated. The court ruled on this argument in its opinion denying the cross-motions for sum-

*Damages*

 When property is taken by the government, the proper measure of just compensation is said to be the property's fair market value at the time of the taking. *See, e.g., Yuba Natural Resources v. United States,* 904 F.2d 1577, 1580 (Fed.Cir. 1990, *reh'g denied* July 6, 1990) (citing *Almota Farmers Elevator & Warehouse Co. v. United States,* 409 U.S. 470, 474, 473–74, 93 S.Ct. 791, 794, 794–95, 35 L.Ed.2d 1 (1973)) (comparing the measure of damages in permanent and temporary takings). Although the property retains a residual value of $12,500, this effectuates the purpose of an action in inverse condemnation, which is to produce a result comparable to the one that would have been reached had the government directly condemned the property. For the reasons stated above, the property's fair market value was $2,658,000 on the date of taking; in addition, damages must include interest on that amount from the taking date as a measure of just compensation.

## CONCLUSION

Based on the foregoing, the court concludes that the denial of plaintiff's permit application effected a taking of 12.5 acres of plaintiffs' property as of May 5, 1982. To fulfill the mandate of the fifth amendment, the court awards plaintiff the amount of $2,658,000 plus interest from the date of taking, as a measure of just compensation. Plaintiff will tender the deed to the 12.5 acres upon the satisfaction of the judgment. It should be noted that plaintiffs indicated at trial that they expected to convey all or a substantial portion of their 51 acres of undeveloped land to the government upon the conclusion of this litigation, although they are not required to do this.

The entry of judgment will be stayed pending the determination of attorneys fees and costs to which plaintiff is entitled pursuant to 42 U.S.C. § 4654 (1988). Plain-

mary judgment, 15 Cl.Ct. at 391–93, and, as previously noted herein, will not reconsider its decision. It is clear to the court that plaintiffs reasonable investment-backed expectations have been frustrated. The court also gave its opinion

tiff is to file any such claim within 60 days from the filing of this opinion.

IT IS SO ORDERED.

on the relative public and private interests at stake in considering whether the regulatory action advanced a legitimate state interest, *see* 15 Cl.Ct. at 388–91; this opinion has not changed, and needs no clarification.